STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Peter A. FONTE,† Defendant-Appellant.

Supreme Court

*No. 2003AP2097–CR. Oral argument March 10, 2005.
—Decided June 15, 2005.*

2005 WI 77

(Also reported in 698 N.W.2d 594.)

Motion for reconsideration denied 10-21-05. Order modifies
¶ 29, n.9. See PDC 2005 WI 145.

654

657

659

For the plaintiff-respondent-petitioner the cause was argued by *William L. Gansner*, assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager*, attorney general.

For the defendant-appellant there was a brief and oral argument by *Martha K. Askins,* assistant state public defender.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. The State seeks review of a court of appeals decision reversing the conviction of Peter Fonte for homicide by intoxicated operation of a vehicle under Wis. Stat. § 940.09 (2001–02),[1] after a boating accident that resulted in the death of one of Fonte's friends. The five issues presented on appeal[2] are: (1) whether the jury instruction that was given for chemical tests of intoxication denied Fonte of a fair trial; (2) whether there was sufficient evidence in the record that Fonte was operating the boat at the time of the accident to support the conviction; (3) whether Fonte was denied effective assistance of counsel; (4) whether Fonte's motion for change of venue due to pretrial publicity should have been granted; and (5) whether § 940.09 is constitutional. Because we rule against Fonte on each issue, we

---

[1] All further references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[2] The court of appeals ruled on the jury instruction issue and did not consider the other issues. Both parties have briefed all the issues, and rather than remand to the court of appeals for consideration of the issues it did not discuss, we address them. *See State v. Johnson,* 153 Wis. 2d 121, 124–26, 449 N.W.2d 845 (1990).

661

reverse the court of appeals and remand the case to the circuit court with directions to reinstate Fonte's conviction.

## I. BACKGROUND

¶ 2. This case arose from a boating accident on Geneva Lake on July 16, 2001. Several days before, Fonte and a group of friends had gathered for a concert at Alpine Valley. The group stayed in the area, and on the day of the accident, they rented a motorboat to spend a day on the lake. The group included Fonte, Traci Paladino, Chad Mattingly, Lee Bovarnick, Kelly Pleffner and Christopher Gibbs.

¶ 3. While they were out on the lake, at least four people jumped into the water to swim, including Paladino, Pleffner and Gibbs. Pleffner testified that the motor was idling and the boat was drifting while they swam. Pleffner saw the boat coming toward her when it was approximately five feet away. She attempted to dive below the surface of the water to avoid the boat, but felt the bottom of the boat scrape her side. When Pleffner resurfaced, she saw Gibbs and heard someone ask, "Where's Traci?" Pleffner then noticed there was blood in the water. Several members of the group jumped in the water to search for Paladino. Shortly thereafter the Water Safety Patrol arrived and a dive team took up the search.

¶ 4. Walworth County sheriff's deputies took the group to the City of Lake Geneva Police Department where officers separated them for individual questioning. Walworth County Deputy Sheriff Jeffery Patek interviewed Fonte. Fonte identified himself as Anthony Michaels. Patek smelled intoxicants coming from Fonte and noticed that his eyes were bloodshot and his speech

was impaired. Patek asked Fonte if he had been drinking and Fonte stated that he had not. Patek performed the horizontal gaze nystagmus test on Fonte, and based on the results of this test, Patek concluded that Fonte was "under the influence of intoxicants." Fonte was given a breathalyzer test that registered an alcohol content of .06% at approximately 9:00 p.m.

¶ 5. Patek asked Fonte if there was anything Fonte needed to tell him. Fonte told Patek that when the swimmers jumped into the water he believed he had put the boat into neutral. Fonte then stated that he stood up from the controls and walked away. Patek placed Fonte under arrest and Fonte submitted to a blood draw at approximately 10:42 p.m. Analysis of his blood showed his blood alcohol content was then .052%.

¶ 6. Fonte was charged with homicide by the operation of a vehicle while under the influence of an intoxicant and with a prohibited alcohol concentration (PAC) contrary to Wis. Stat. § 940.09(1)(a) and (b).[3] Paladino's body was recovered approximately five months after the accident and the parties stipulated that the boat propeller caused her death.

¶ 7. Fonte moved to change venue due to extensive pretrial publicity that he argued would prejudice the jury if selected in Walworth County. The court denied the motion for a change of venue, and stated that a fair trial could be achieved through careful screening of the jury.

---

[3] The information added a count of obstruction, to which Fonte pled guilty, and counts of injury to another person by operation of a motorboat while under the influence and with a prohibited blood alcohol content under Wis. Stat. §§ 30.681(2)(a) and (b) and 30.80(6)(a) and (b).

¶ 8. The trial began March 11, 2002 and resulted in Fonte's conviction. The circuit court[4] imposed a 25–year bifurcated sentence, consisting of seven years of confinement and 18 years of extended supervision. Fonte moved for post-conviction relief, alleging several errors at trial. The court denied the motion. On appeal, the court of appeals reversed Fonte's conviction based on its conclusion that the jury instruction regarding chemical tests for intoxication was misleading, and remanded to the circuit court for a new trial. The State appealed the reversal, and both sides briefed the remaining issues that the court of appeals did not decide.

## II. DISCUSSION

### A. Standard of Review

¶ 9. Fonte raises five issues, each of which has its own standard of review. Regarding the jury instruction issue, a circuit court has broad discretion in deciding whether to give a particular jury instruction. A court must exercise its discretion to "fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence." *State v. Coleman*, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996) (citation omitted). However, we independently review whether a jury instruction is an accurate statement of the law applicable to the facts of a given case. *State v. Groth*, 2002 WI App 299, ¶ 8, 258 Wis. 2d 889, 655 N.W.2d 163.

---

[4] At the trial held in Walworth County Circuit Court, Judge Robert J. Kennedy presiding.

¶ 10. In reviewing the sufficiency of the evidence to support a conviction, we do not overturn a jury's verdict "unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *See State v. Poellinger,* 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990).

¶ 11. The standard of review for ineffective assistance of counsel's components of deficient performance and prejudice present mixed questions of law and fact. *State v. Johnson,* 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990) (citing *Strickland v. Washington,* 466 U.S. 668, 698 (1984)). A circuit court's findings of historic fact, "the underlying findings of what happened," will not be overturned unless clearly erroneous. *State v. Pitsch,* 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985). Questions of whether counsel's performance was deficient and prejudicial are questions of law we review de novo. *Id.*

¶ 12. "We review [a circuit] court's denial of [a] change of venue motion under the erroneous exercise of discretion standard." *State v. Albrecht,* 184 Wis. 2d 287, 306, 516 N.W.2d 776 (Ct. App. 1994). However, we independently evaluate the circumstances " 'to determine whether there was a reasonable likelihood of community prejudice prior to, and at the time of, trial and whether the procedures for drawing the jury evidenced any prejudice on the part of the prospective or empaneled jurors.' " *Id.* (quoting *State v. Messelt,* 178 Wis. 2d 320, 327–28, 504 N.W.2d 362 (Ct. App. 1993)).

¶ 13. And finally, the constitutionality of Wis. Stat. § 940.09 is a question of law that we review de novo. *See Maurin v. Hall*, 2004 WI 100, ¶ 93, 274 Wis. 2d 28, 682 N.W.2d 866.

B. Jury Instruction

¶ 14. The State argues that the jury instruction properly explained the law regarding chemical tests for intoxication under Wis. Stat. § 885.235.[5] We agree and therefore conclude that the instruction did not deprive Fonte of his right to due process of law.

¶ 15. "The validity of [a] jury's verdict [is affected by] the correctness of the jury instructions." *State v. Dodson*, 219 Wis. 2d 65, 87, 580 N.W.2d 181 (1998). "A challenge to [a conviction based on] an allegedly erroneous jury instruction warrants reversal and a new trial only if the error [is] prejudicial." *Fischer v. Ganju*, 168 Wis. 2d 834, 849, 485 N.W.2d 10 (1992). "An error is prejudicial if it probably and not merely possibly misled the jury." *Id.* at 850. We will not reverse a conviction if the overall meaning communicated by the jury instruc-

---

[5] Wisconsin Stat. § 885.235 states in relevant part:

Chemical tests for intoxication.

. . .

(3) If the sample of breath, blood or urine was not taken within 3 hours after the event to be proved, evidence of the amount of alcohol in the person's blood or breath as shown by the chemical analysis is admissible only if expert testimony establishes its probative value and may be given prima facie effect only if the effect is established by expert testimony.

tions was a correct statement of the law. *See State v. Paulson,* 106 Wis. 2d 96, 108, 315 N.W.2d 350 (1982).

¶ 16. At trial, the State submitted a proposed instruction that allowed the jury to find that Fonte had a PAC of 0.1 or higher at the time of his operation of the boat as prima facie evidence that he was under the influence of an intoxicant at that time. Fonte objected, arguing that the proposed instruction should not be given because his blood draw was taken more than three hours after the alleged operation. The court concluded that Wis. Stat. § 885.235(3) allows a jury to find that a PAC of 0.1 or higher is prima facie evidence of the defendant being under the influence when expert testimony establishes that the results of the delayed blood draw and the test have the effect of showing the defendant's blood alcohol level would have been 0.1 or higher at the time of the operation of the motor vehicle. Accordingly, because it found that the necessary nexus of expert opinion evidence was presented, it gave the following instruction:

> Evidence has been received that a sample of the defendant's breath and blood were taken—was taken. An analysis of the samples has also been received. If you are satisfied beyond a reasonable doubt that there was .10% or more by weight of alcohol in the defendant's blood, or .10 grams or more of alcohol in 210 liters of the defendant's breath at the time of operation, you may find from that fact alone that the defendant was under the influence of an intoxicant at the time of the alleged operating, but you are not required to do so.

¶ 17. Fonte argues that the jury instruction is not appropriate in Wis. Stat. § 885.235(3) cases because those tests do not come within the requirements of § 885.235(1g). Subsections 885.235(1g) and (3) do differ

in that under subsection (1g), chemical test analysis is admissible without requiring expert testimony, while under subsection (3), chemical test analysis is admissible "only if expert testimony establishes its probative value." Also, under § 885.235(1g)(c), analysis showing that a person's PAC was 0.1 or higher is prima facie evidence that he or she was under the influence of an intoxicant or had an alcohol concentration of 0.1 or higher. Under subsection (3), the alcohol concentration analysis "may be given prima facie effect only if the effect is established by expert testimony."

¶ 18. At trial, the State's expert, Casey Collins,[6] testified in regard to the effect that the delayed blood draw and test results had upon Fonte's alcohol concentration at the time of the alleged operation, as follows:

Q: Mr. Collins, the last substance on the report is an alcohol—ethanol level, and what was that ethanol level?

A: 0.052 grams per hundred milliliters, or grams percent.

Q: And was that in his blood?

A: Yes, that was the whole blood sample.

Q: If you were to assume that this incident happened at approximately 3:55 in the afternoon, and that the blood sample was taken at 10:42 in the evening, is it possible for you to state to a

[6] Casey Collins testified that he is employed by the State of Wisconsin as the technical unit leader of the toxicology section of the Madison Crime Laboratory. Collins has a degree in forensic toxicology and has tested tens of thousands of samples for the presence of alcohol.

reasonable degree of professional certainty what Mr. [Fonte's] blood alcohol level was at 3:45, assuming no consumption of alcohol after 3:45?

A: I would—I could make an estimate, and I would give you a range with that estimate. . . .

Q: And how would you go about doing that calculation?

A: I would use the average elimination rate of a male human, multiply that elimination rate times the number of hours between the blood draw and the incident, and add that on to the blood alcohol level that we measured at 10:42.

Q: And is it possible for you to do that calculation now?

A: Yeah, sure. . . .

. . .

Now, there is a—there are ranges of elimination rates, so we must try to—we must compensate for that. So the low end of the range would be an elimination rate of .010, so that would . . . [result in a concentration of] 0.122 as the low end of the range.

. . .

All right, now the higher elimination rate . . . -would . . . [result in a concentration of] 0.227, so we have a range of .1 to .22, with the average or the middle ground being [a concentration of] .157 . . . .

. . .

Q: And can you state to a reasonable degree of professional certitude—or certainty, rather, us-

ing the breath test result in this case, what his alcohol would have been as it relates to the legal standards of .10 at 3:45 in the afternoon, assuming no consumption of alcohol after 3:45?

A: I would stick with my blood back extrapolation. I would just use that breath to see that he was in the elimination phase. I wouldn't—um, I, I mean I can do that, mathematically. So we have .074 at what time? This is at 9:02, right?

Q: Yes.

A: And the incident—so that's five, five hours and 15 minutes since the accident? Somebody help me here.

Q: Yes.

A: Okay, so .015 times 5.25, plus .074. I come up with a .152.

We conclude that this testimony is sufficient to satisfy Wis. Stat. § 885.235(3) because the expert testified to a reasonable degree of certainty what Fonte's blood alcohol level was at the time of the accident. Therefore, the circuit court did not err in giving the objected-to instruction.

C. Sufficiency of the Evidence

¶ 19. Fonte also argues that there was insufficient evidence at trial to prove beyond a reasonable doubt that he was the operator of the boat at the time of the accident. In evaluating the evidence, we give all reason-

able inferences to it that will support the verdict. *See State v. DeLain,* 2005 WI 52, ¶ 11, 280 Wis. 2d 51, 695 N.W.2d 484.

¶ 20. Both Fonte and the State point to the same evidence, but come to different conclusions. Three of the four people on the boat (not including Fonte) who testified stated that they did not see who was operating the boat at the time of the accident. The fourth, Chad Mattingly, at first testified that he did not see who was driving, but was impeached with evidence of a prior statement he gave to police. He testified as follows:

> Q. On the night of July the 16th, do you recall . . . indicating to the officer who was operating the boat at the time of the accident?
>
> A. After some time, um, yes, I did. Um, it was—he kind of, I mean, helped me through my state-ment. I was kind of having a tough time getting some words out, and he was helping me along and kind of like, you know, feeding me some stuff and trying to help me get, you know, my words out, and I—we both kind of like sort of came to the conclusion that it had been Pete, and I kind of just went along with it, and I should have been a hundred percent sure; and I didn't know it was going to escalate like this.
>
> Q. Well, you understand we're only interested in what you observed and—and the truth?
>
> A. Right.
>
> Q. Okay. Now did you—do you know who you told the officer was driving the boat at the time of the accident?
>
> A. He or—If I remember correctly, I think he might

of said, well—then it was something like, well, it might have been Rabbit?[7] And then I was like, I don't know. And then, um, I can't really recall what he said next, and then I guess I agreed with him . . . .

The other evidence implicating Fonte as the operator was the testimony of Officer Patek, who interviewed Fonte at the police station the night of the accident. Patek testified that he asked Fonte "if there was anything he needed to tell [him]," and Fonte became "emotionally upset" and "started to cry." Fonte then stated "I thought the boat was out of gear. Oh, my God, I thought the boat was out of gear." Patek further testified as follows:

Q. And what next did [Fonte] say to you?

A. Um, he stated that they were going down the lake, um, that some subjects jumped off the back of the boat to go swimming. He stated that he pulled back on the controls.

Q. Did he indicate then what direction the boat began to move at that point in time?

A. I believe he said the boat was still going forward at that time.

Q. Did you ask him what happened next?

A. Yes.

Q. What did he say?

---

[7] There was testimony that Fonte was also known by his nickname, "Rabbit."

A. Um, that once the boat was back where he thought it was in neutral, he had gotten up from the controls and walked away.

Q. And did you ask him then what happened?

A. Yes.

Q. What was his response?

A. The boat at that time, um, continued in a sharp or tight turn and came back through the swimmers that were in the water.

Fonte argues that this evidence is not sufficient to prove beyond a reasonable doubt that Fonte was the operator of the boat. He argues the evidence shows only that Fonte had been driving the boat at some time prior to the accident, but that the jury had no way of knowing whether someone else had touched the controls before the accident or if it was Fonte's actions that caused the accident.

¶ 21. Reviewing the evidence in the light most favorable to the verdict, we conclude the jury could have found beyond a reasonable doubt that Fonte was the operator. Fonte's statements to Officer Patek could be understood as an admission that his operation of the boat was responsible for the accident. Patek's testimony that Fonte began to get emotional and cry as he stated, "I thought the boat was out of gear. Oh, my God, I thought the boat was out of gear," could lead a reasonable jury to find that Fonte believed he was operating the boat at the time of the accident and that it was his failure to put the boat in neutral that caused the accident. Additionally, Mattingly's grudging admission that he had agreed that Fonte was operating the boat

corroborates this inference. Therefore, we conclude that the jury had sufficient evidence before it to find beyond a reasonable doubt that Fonte was operating the boat at the time of the accident.

D. Ineffective Assistance of Counsel

¶ 22. Fonte next argues that he was denied his constitutional right to the effective assistance of counsel when his trial counsel failed to object to evidence revealing Fonte's alias and failed to object to evidence relating to his lifestyle.

¶ 23. *Strickland* sets out the test for determining whether effective assistance of counsel was denied:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687. We have adopted the *Strickland* test. *See Johnson,* 153 Wis. 2d at 127. We have also explained, "Review of counsel's performance gives great deference to the attorney and every effort is made to avoid determinations of ineffectiveness based on hindsight." *Id.* "Rather, the case is reviewed from

counsel's perspective at the time of trial, and the burden is placed on the defendant to overcome a strong presumption that counsel acted reasonably within professional norms." *Id.* (citing *Strickland,* 466 U.S. at 687). In addition to deficient performance, a defendant must prove that the defense was prejudiced, so that the defendant was denied a fair trial with a reliable result. *Id.* (citing *Strickland,* 466 U.S. at 687).

### 1. Use of an alias

¶ 24. Fonte claims his counsel's performance was deficient because she failed to object to repeated references to Fonte's use of the alias, "Anthony Michaels," which Fonte employed upon his arrest and at his first court appearance. The use of this alias led to an obstruction charge, to which Fonte pled guilty on the first day of trial. Fonte points us to numerous places in the record where the prosecutor, in the course of examining Fonte's friends, referred to Fonte as Michaels and asked them if they knew Fonte's real name before the accident. They responded that they did not, but rather, knew him as Anthony Michaels or "Rabbit." Law enforcement witnesses also testified that Fonte identified himself as Michaels on the day of the accident.

¶ 25. Fonte argues that "[p]rudent defense counsel would have objected to the state's use of Fonte's alias," that the use of an alias was irrelevant to the charges, and that it was prejudicial because "[c]riminals, not innocent people, use aliases. People who have an alias are hiding something." The State argues that Fonte was known to many of the witnesses as Michaels, and calling him Michaels at trial was the natural result

of communicating with witnesses who knew Fonte as Michaels. In addition, at the post-conviction motion hearing regarding ineffective assistance, Fonte's trial counsel stated that she was concerned that the use of the alias might confuse or prejudice the jury, but "believed that it was a better decision to have the State bring it out and us explain later that this was a name who all of his friends knew him as." She also said that she and Fonte had agreed to proceed this way because it would have been difficult to examine witnesses who knew Fonte as Michaels without using the name they knew.

¶ 26. In denying the post-conviction motion, the circuit court stated "it would have been a tactical nightmare . . . to try to avoid the use of the [alias]" and that efforts to avoid all mention of the name by counsel and in exhibits would have been confusing to the jury to the point of possibly being a ground for post-conviction relief had they proceeded that way.

¶ 27. We are not persuaded by Fonte's arguments, but rather agree with the circuit court. Trial counsel's explanation of her reasons for permitting the use of the alias, which was reached after consultation with Fonte, is reasonable. Given that Fonte was known by different names to different witnesses, having the alias known avoided confusion for the jury. We also note that the nature of this crime, which arose from an accident rather than a premeditated desire to injure someone, makes the argument that "only criminals use aliases" less persuasive, because intent was not an element of this crime.

2. Evidence of lifestyle

¶ 28. The testimony the State presented of Fonte's lifestyle forms an additional basis for Fonte's

claim of ineffective assistance of counsel. Fonte argues that testimony painted an unflattering view of him by showing that: (1) he and his friends were in town to hear a concert by Phil Lesh, bass player for the Grateful Dead, a band whose followers are widely known as "Dead Heads;" (2) he had attended more than fifty concerts over the previous one to two years; (3) his group of friends knew each other only by first names or nicknames; and (4) the group had all slept together in one hotel room the night before the accident.[8] Fonte argues this evidence paints him as a person who either does not have a job or has little responsibility and is more likely to abuse drugs or alcohol.

¶ 29. We conclude that Fonte's arguments regarding testimony about his lifestyle are unpersuasive. We agree with the circuit court and Fonte's trial counsel that testimony concerning the group of friends frequently attending concerts is not prejudicial to Fonte. We agree that the jury, after hearing this evidence, would not necessarily interpret it as Fonte argues. There is little reason to think Fonte was unemployed based on the fact that he traveled to fifty concerts. While we agree that drug abuse and alcohol abuse have been reported as having occurred at rock concerts, Fonte fails to show how this point, given other evidence[9] raised against him in the circuit court, is sufficient to undermine our confidence that Fonte received a

_____

[8] Fonte also cites to a comment made by the prosecution that Fonte created a criminal record as he followed bands around the country. This comment was made at Fonte's initial appearance regarding bail, not in front of the jury. Therefore, it is not relevant to our discussion.

[9] The jury heard unrefuted testimony that Fonte had a blood alcohol level at the time of the accident of at least 0.122.

fair trial with a reliable verdict. Accordingly, we reject Fonte's argument that he was denied effective assistance of counsel.

E. Change of Venue

¶ 30. Fonte argues the circuit court erred in denying a change of venue. He contends he submitted enough evidence to show the pretrial publicity would prevent a fair trial in Walworth County.

¶ 31. In making our evaluation of the publicity, we consider the following factors:

> (1) the inflammatory nature of the publicity; (2) the timing and specificity of the publicity; (3) the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; (4) the extent to which the jurors were familiar with the publicity; (5) the defendant's utilization of peremptory and for cause challenges of jurors; (6) the State's participation in the adverse publicity; (7) the severity of the offense charged; and (8) the nature of the verdict returned.

*Albrecht,* 184 Wis. 2d at 306. Fonte supplied the circuit court with 44 newspaper articles[10] from area newspa-

---

[10] Shortly before the trial, newspaper articles were published stating that syringes, one of which had Fonte's DNA on it, were found in the hotel room Fonte had occupied. The trial court ruled that this evidence was irrelevant and prejudicial and thus ruled it inadmissible at trial. This is the kind of evidence that could be considered inflammatory, but as we explain in our discussion of the voir dire process below, ¶ 37, the court dismissed all potential jurors who said they had read about the case in the time immediately preceding the trial, and therefore might have seen these articles.

pers dated July 17, 2001 to January 10, 2002, focusing on the first, second and fourth *Albrecht* factors. He argues that the voir dire process did not cure the jury of the prejudicial effect of that publicity.

¶ 32. With regard to the first factor, the inflammatory nature of the publicity, we note that objective, factual, non-editorial reporting is not prejudicial. *Briggs v. State,* 76 Wis. 2d 313, 327, 251 N.W.2d 12 (1977).

> A court looking to the inflammatory nature of the publicity should be primarily concerned with the manner in which the information was presented. Uneditorialized news of an informational nature may inform possible members of a jury, but this does not necessarily make the information objectionable. News reports become objectionable when they editorialize, amount to "rabble rousing" or attempt to influence public opinion against a defendant.

*Id.* At the motion hearing, Judge Kennedy stated:

> I don't see the publicity as being unduly prejudicial . . . nor do I find it even inflammatory. It's mostly factual about what happened. It is not . . . written with the intent to pillory and convict Mr. Fonte before he's ever . . . before trial. It factually reports what's happening in the courts, what evidence has been produced at the preliminary hearings and has come out in public documents that the press has access to and which, by the way, any member of the public can come in and read too.

¶ 33. We agree with the circuit court's characterization of the publicity. The articles contained factual, non-editorial reporting about the accident and the criminal proceedings against Fonte. Some of the articles focused not on Fonte, but on the search for Paladino's

body, which took several months to recover. To the extent the coverage contained possibly inflammatory elements, such as a headline stating he had a "history of run-ins with authorities," a statement calling his record "a laundry list of criminal activity" or a story containing statements about Fonte's operation of the boat, that coverage was offset by other factors we explain below, ¶¶ 34, 36–37, such as the long time period between the coverage and the trial and the circuit court's effective use of voir dire. In any case, we cannot characterize the publicity as "rabble rousing" or an attempt to influence public opinion against Fonte.

¶ 34. The second factor, the timing and specificity of the publicity, works against the jury pool being prejudiced. More than half of the articles were published in July and August immediately after the accident. Those published between September and January generally focused on either the search for Paladino's body or summaries of the proceedings against Fonte. The articles Fonte believes are inflammatory due to statements about his prior record or disputed events being asserted as fact were published on July 25 and 26, more than seven months before the trial. The gap between these articles and the trial is such that "the memories and passions of readers had time to fade." *Messelt,* 178 Wis. 2d at 330.

¶ 35. Fonte also cites the fourth *Albrecht* factor, the extent to which the jurors were familiar with the publicity. He argues that the court's findings that the circulation of the newspapers was about 20,000, while there were approximately 79,000 potential jurors in the area, show that a "significant percentage" of potential jurors were influenced by the publicity. We do not rely on specific percentages to determine whether there was prejudice; however, a significant number of potential

jurors could have been exposed to the publicity. This extensiveness factor does not weigh heavily in our determination because of the circuit court's use of voir dire, which we describe below.

¶ 36. Finally, Fonte argues that voir dire, which is mentioned in the third and fifth *Albrecht* factors, did not successfully solve the problems raised by the publicity. He argues that the effects of the publicity were not eliminated because five of the twelve jurors said either that they had read about the case or thought they had read something about the case. Fonte also states that four of his five peremptory challenges were used on potential jurors who had read about the case.

¶ 37. After examining the transcript of voir dire, we are satisfied that it ensured an impartial jury. The circuit court individually questioned potential jurors about whether they had seen coverage of the case and whether it tainted their ability to be impartial. The court excused eleven potential jurors who said they had formed an opinion about the case, ten of whom had been exposed to pretrial publicity. The court stated it must "err on the side of caution" and "be on the safe side" in excusing potential jurors who were uncertain whether they could be impartial. In addition, as we mentioned in our discussion on the inflammatory nature of the publicity, supra ¶¶ 32–33, the court dismissed four jurors who had read articles published shortly before the trial mentioning syringes found in the room Fonte originally occupied because the court decided such evidence would be prejudicial. Therefore, we conclude that voir dire was properly employed by the circuit court to produce an impartial jury.

## F. Constitutionality of Wis. Stat. § 940.09

¶ 38. Finally, Fonte challenges[11] the constitutionality of Wis. Stat. § 940.09, "Homicide by intoxicated use of vehicle or firearm,"[12] arguing that the statute unconstitutionally relieves the State of the burden of proving beyond a reasonable doubt a causal connection between a defendant's intoxication and the death by requiring the State to prove only that operation by an intoxicated driver caused the death. He asks that we overrule our decision in *State v. Caibaiosai,* 122 Wis. 2d 587, 363 N.W.2d 574 (1985), where we rejected this precise argument. We decline to do so. While the doctrine of stare decisis "contemplates that under limited circumstances a court may overrule outdated or erroneous holdings," *Cook v. Cook,* 208 Wis. 2d 166, 186,

---

[11] The court of appeals stated that Fonte abandoned this issue in his reply brief. *State v. Fonte,* No. 2003AP2097–CR, unpublished slip op. at 2 n.1 (Wis. Ct. App. Aug. 4, 2004). In his reply brief below, Fonte stated "[b]oth parties agree that this court is bound by *State v. Caibaiosai,* 122 Wis. 2d 587, 363 N.W.2d 574 (1985), which upheld the constitutionality of Wis. Stat. § 940.09. Only the supreme court has the authority to overrule *Caibaiosai,* and thus, no reply to the state's brief is warranted here." On appeal here, both parties agree that Fonte *abandoned his argument only with respect to the court of appeals* and properly raised the issue here.

[12] Wisconsin Stat. § 940.09 states in relevant part:

Homicide by intoxicated use of vehicle or firearm. (1) Any person who does any of the following is guilty of a Class B felony:

(a) Causes the death of another by the operation or handling of a vehicle while under the influence of an intoxicant.

(b) Causes the death of another by the operation or handling of a vehicle while the person has a prohibited alcohol concentration, as defined in s. 340.01(46m).

560 N.W.2d 246 (1997), our reasoning in *Caibaiosai* is sound. In *Caibaiosai* we stated:

> The legislature has determined that combining the operation of a motor vehicle with being in an intoxicated state is conduct which is *malum prohibitum* and is pervasively antisocial. Since the conduct is considered inherently evil, it conceptually cannot be divided into portions which are bad and portions which are not bad. Section 346.63, Stats., entitled "Operating under the influence of intoxicants" is violated by a person who, one, operates a motor vehicle, and two, is at the time under the influence of an intoxicant. The commission of the offense does not require any erratic or negligent driving. Because driving under the influence of an intoxicant is *malum prohibitum* it is impossible to separate the intoxication from the driving or the driving from the intoxication. The result is the potentially lethal and illegal combination of driving while intoxicated.
>
> Section 940.09, Stats., requires that the prosecution prove and the jury find beyond a reasonable doubt a causal connection between the defendant's unlawful conduct, operation of a motor vehicle while intoxicated, and the victim's death. The statute does not include as an element of the crime a direct causal connection between the fact of defendant's intoxication, conceptualized as an isolated act, and the victim's death. Under this statute there is an inherently dangerous activity in which it is reasonably foreseeable that driving while intoxicated may result in the death of an individual. The legislature has determined this activity so inherently dangerous that proof of it need not require causal connection between the defendant's intoxication and the death.

*Caibaiosai*, 122 Wis. 2d at 593–94. We affirm *Caibaiosai* and reject Fonte's argument that § 940.09 is unconstitutional.

## III. CONCLUSION

¶ 39. We conclude the following: (1) the jury instruction that was given for chemical tests of intoxication did not deny Fonte of a fair trial; (2) there was sufficient evidence in the record that Fonte was operating the boat at the time of the accident to support the conviction; (3) Fonte was not denied effective assistance of counsel; (4) the decision to deny Fonte's motion for change for venue due to pretrial publicity was appropriate; and (5) Wis. Stat. § 940.09 is constitutional. Because we have ruled against Fonte on each issue, we reverse the court of appeals and remand the case to the circuit court with directions to reinstate Fonte's conviction.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded with directions.

¶ 40. N. PATRICK CROOKS, J., did not participate.