COURT OF APPEALS
DECISION
DATED AND FILED

January 13, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP2301-CR**

Cir. Ct. No. 2017CF13

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DAVID T. HANKE,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Washington County: JAMES G. POUROS, Judge. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Davis, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. David T. Hanke appeals from a judgment convicting him of sexual assault of a student by a staff member. Hanke argues that (1) the evidence was insufficient to support the jury's guilty verdict, (2) the circuit court erroneously admitted other-acts evidence, and (3) the circuit court erred in denying Hanke's motion for a change of venue. For the reasons that follow, we affirm.

## BACKGROUND

¶2 In 2017, Hanke, a Slinger High School band teacher, was charged with sexual assault of a student by a school staff member in violation of WIS. STAT. § 948.095(2) (2017-18).[1] The criminal complaint alleged that in September 2000, Hanke invited a student, R.A.S., to his home. He offered her a beer and the two engaged in small talk. Hanke invited R.A.S. to his basement and offered her a back rub. After he began massaging R.A.S., Hanke suggested that she "remove her shirt and bra so he could provide a proper massage." R.A.S. reluctantly did so and laid facedown on the floor at Hanke's request. Hanke then straddled R.A.S. and massaged her back before reaching under her and "grabbing, groping and massaging her bare breasts with his hands."

¶3 The State filed motions to admit other-acts evidence, including testimony from eight former Slinger students who alleged witnessing or being victims of inappropriate conduct by Hanke; testimony from Hanke's relative about photos he had seen on Hanke's computer; conduct reports from Slinger High

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

School raising concerns about activities in the band room; and testimony from the former assistant band director.

¶4     The circuit court denied the State's other-acts motion as to everything except for evidence concerning three former female students, R.K.H., D.A.W., and J.M.M., each of whom had participated in the Slinger band while Hanke was the instructor.  All three reported that Hanke invited them to his house shortly after they graduated from Slinger; that once alone with Hanke at his house, he offered them backrubs; and that Hanke either touched or attempted to touch their genitals during the massage.  Given the similarities between each woman's report and the facts alleged by R.A.S., the court ruled their testimony admissible and stated it would provide the jury a cautionary instruction.

¶5     Hanke also filed a motion for a change of venue, arguing that "an impartial trial [could not] be had in Washington County" on account of "[t]he media attention" received by the case.  Hanke attached to his motion numerous news articles that he claimed had tainted the public perception of the case.  The State objected to the motion.  The circuit court denied the motion, determining that the publicity was not inflammatory and was more than one year old, and that the District Attorney's Office had not participated in any adverse publicity.  The court stated that it would address the pretrial publicity during jury selection.

¶6     During voir dire, the circuit court asked the potential jurors whether they knew Hanke and struck any potential juror who answered in the affirmative and believed they could not be impartial.  The court then asked the potential jurors whether they "may know something about this case from any source; including newspaper, radio, social media, or television accounts."  The court discussed with each potential juror who answered in the affirmative whether they could still be

3

impartial and struck any juror who believed that they could not. In the end, only one of the fourteen jurors empaneled said that they had been exposed to pretrial publicity, and this juror said that the exposure would not affect their ability to be impartial.

¶7    At trial, R.A.S. testified that her date of birth is October 19, 1982, that she attended Slinger High School from 1997 to 2001, that she participated in band throughout her high school years, and that Hanke was her band director. R.A.S. also testified that her relationship with her parents was "a little rocky" and that Hanke acted "like a friend" or "father" to her. R.A.S. testified that she would have private lessons with Hanke and that Hanke would comment that her breasts "were nice" and that she was "sexy."

¶8    With regard to the charged assault, R.A.S. testified that Hanke invited her to his house sometime in "[t]he first two weeks of September" 2000. R.A.S. recalled driving to Hanke's home and that she was wearing "[j]eans and a T-shirt" that day and "did not have a jacket." Hanke gave R.A.S. a beer and told her that he "wanted to show [her] the basement."

¶9    In the basement, Hanke told R.A.S. that he "wanted to give [her] a back rub" and she "reluctant[ly]" agreed. Hanke started massaging her but said that in order to "give a proper massage, [R.A.S.] would have to take [her] shirt and [her] bra off." R.A.S., again "reluctantly," "took off [her] shirt and bra" and "threw them to the side," feeling as though she "could [not] say no" to Hanke. R.A.S. then "laid on the floor," "[f]ace down" with her "head to the side" and her "hands under [her] head," "looking at the wall." Hanke "straddled over the top of [R.A.S.]" with "[h]is left knee ... on the ground" to R.A.S.'s left and "his right foot on the ground" to R.A.S.'s right. Hanke began rubbing R.A.S.'s back but "quickly

moved to ... put his hands in between the carpet" and R.A.S.'s body "and was groping and massaging [her breasts]." Hanke "was moving [his hands] all around and squeezing and rubbing all of [R.A.S.'s] breast" on "[b]oth" sides for "[a]bout five minutes." R.A.S. "felt scared" and "froze," not "know[ing] what to do" and "worried" that Hanke may do something worse. R.A.S. could not remember how the assault ended but remembered "standing in the basement turned away from him, embarrassed, putting on [her] clothes." As she walked to her car, Hanke "said something about a circle of trust" and made a circular motion "with his hand." R.A.S. "dr[ove] to [her] boyfriend's house," "in shock," and decided that she should "not say anything" because she "just wanted to forget it ever happened." The incident was not reported to law enforcement until May 2016, after R.A.S. sent an e-mail to the Slinger High School principal.

¶10    Detective Hope Demler testified that she was the lead investigator on the case. She testified that R.A.S. initially indicated that the assault occurred when she was sixteen, during her junior year of high school. Demler asked R.A.S. to narrow down the time frame by looking at old photos and yearbooks, and R.A.S. did so, informing Demler that she had narrowed the time frame to the first two weeks in September 2000.

¶11    Like R.A.S., R.K.H., J.M.M., and D.A.W. all testified that they had a close, friendly relationship with Hanke, describing him as a "father figure" and confidante. All testified that they witnessed and/or received backrubs from Hanke at school. Each testified about incidents where Hanke touched them inappropriately at his house under the pretense of a backrub.

¶12    R.K.H. testified that after she graduated, she would see Hanke in town and he would insist that they "get together before [she] left for college." She

5

finally agreed and just before her eighteenth birthday, Hanke took her out to a restaurant before suggesting that they rent a movie and return to his house. When they returned to his house, Hanke "tried to get [R.K.H.] to go down in his basement to watch the movie," but she did not agree and instead they watched the movie in Hanke's living room. Hanke also offered her alcohol, which she declined. While watching the movie, Hanke began "touching [R.K.H.'s] shoulders" and repeatedly asked her to sit on the floor so he could "give [her] a proper back massage." R.K.H. eventually sat on the floor and Hanke massaged her back, eventually "push[ing]" R.K.H. "to the floor," where R.K.H. laid facedown while Hanke "straddled [her]." Hanke began "massaging [R.K.H.] all over," going "[u]nder [her] shirt" and "[u]nder [her] shorts," eventually reaching "under [her] bra" "touch[ing] the front of [her] breasts." Hanke also moved R.K.H.'s underwear and "touched [her] vagina" with "[h]is fingers."

¶13 J.M.M. testified that shortly after she graduated, Hanke invited her over to his house, claiming that other band members would be there. About ten minutes after arriving at his house, Hanke sat next to J.M.M. on the living-room couch and began to give her a backrub. Hanke then began reaching underneath J.M.M.'s shirt and asked if he could unhook her bra. J.M.M. refused and left Hanke's house.

¶14 D.A.W. testified that on a visit home from college, Hanke invited her over to his house. Hanke offered her a mixed drink and they watched a video of one of their band performances. Hanke began commenting about the female students' skirts, bottoms, and breasts, and said that D.A.W.'s marching gave her breasts "a good bounce." Hanke began massaging D.A.W.'s neck and asked her "to lay on the floor so he could massage [her] back." Hanke then began reaching under D.A.W.'s shirt and D.A.W.'s bra "became unhooked." Hanke "reached

6

underneath [D.A.W.] and tried to massage [her] left breast." Hanke also asked her to unbutton her pants so he could massage her lower back. Hanke then straddled D.A.W., continuing to "try to reach underneath [her] to get [her] left breast" and "to try and take [her] pants lower." Hanke twice asked D.A.W. to go to his bedroom "where it would be more comfortable." When Hanke stood up, D.A.W. "told him [she] needed to leave, grabbed [her] coat and left." She heard him say "something about band family."

¶15 In instructing the jury, the circuit court provided a cautionary instruction regarding other-acts evidence. The court explained that "[e]vidence has been presented regarding other conduct of the defendant for which the defendant is not on trial." As to the evidence of Hanke's conduct with R.K.H., J.M.M., and D.A.W., the court instructed the jury that "[i]f you find that this conduct did occur, you should consider it only on the issues of motive, opportunity, intent, preparation or plan, absence of mistake or accident, and context or background," and that the jury "may not consider this evidence to conclude that the defendant has a certain character" and "acted in conformity with that" character "with respect to the offense charged." The court then defined for the jury motive, opportunity, intent, preparation or plan, absence of mistake or accident, and context or background.

¶16 The jury found Hanke guilty and he was sentenced to five years of initial confinement followed by five years of extended supervision. He appeals.

7

**DISCUSSION**

*Sufficiency of the Evidence*

¶17    In order to convict Hanke, the jury had to find the following elements beyond a reasonable doubt:  (1) Hanke had sexual contact with R.A.S., who was not his spouse; (2) R.A.S. had attained the age of sixteen years and had not attained the age of eighteen years; (3) R.A.S. was enrolled as a student in a school or school district; and (4) Hanke was a member of the school staff of the school or district in which R.A.S. was enrolled.  *See* WIS. STAT. § 948.095(2); WIS JI—CRIMINAL 2139.  Hanke does not dispute the first,[2] third, or fourth elements, but argues that the trial evidence was insufficient to prove beyond a reasonable doubt that R.A.S. had not turned eighteen at the time of the assault.

¶18    We review the sufficiency of the evidence de novo, but in the light most favorable to sustaining the conviction.  *State v. Hanson*, 2012 WI 4, ¶15, 338 Wis. 2d 243, 808 N.W.2d 390.  The standard of review is the same whether the conviction relies upon direct or circumstantial evidence.  *State v. Poellinger*, 153 Wis. 2d 493, 503, 451 N.W.2d 752 (1990).  We will sustain a conviction unless the evidence is so insufficient "that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.* at 501.  "If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt,

---

[2] In addressing the State's brief, Hanke makes a half-hearted and undeveloped argument apparently asserting that the State failed to prove that R.A.S. was not his spouse.  We will not further address this undeveloped argument raised for the first time in Hanke's reply brief.

8

an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it." ***Id.*** at 507.

¶19    We conclude that a reasonable juror could have found beyond a reasonable doubt that R.A.S. had not yet attained the age of eighteen when the assault occurred.  R.A.S. testified that her date of birth is October 19, 1982 and that the assault occurred in the first two weeks of September 2000, when she would have been seventeen years old.  That testimony alone is sufficient to sustain the jury's guilty verdict.

¶20    Further, R.A.S. testified in detail about how she determined the time frame of the assault.  She explained that she knew the assault occurred during her senior year because she went to her boyfriend's home afterward and she dated her boyfriend during her senior year.  R.A.S. also "distinct[ly]" remembered seeing "[f]ull green leaves on the trees outside."  She provided a photograph from October 23, 2000, which showed that the leaves were changing color at that point in time.  R.A.S. also remembered that it was warm outside, that she did not "have a jacket on" and that it was still light outside when she left Hanke's house.  She discussed specific events, explaining that she recalled practicing for the Homecoming parade the day of the assault and that Homecoming took place on September 29 and 30 that year.  R.A.S. also remembered practicing for the school musical starting in mid-September and explained that those practices lasted until after dark, so she could not have gone to Hanke's if she had been practicing for the play.  The State introduced pages from R.A.S.'s yearbook and a program from the musical that supported these dates.  Based on all of this, R.A.S. was "very certain" that the assault took place in the first two weeks of September 2000, when she was seventeen.

9

¶21 Hanke argues that the evidence was insufficient because R.A.S. was initially unsure of the time frame and did not settle on September 2000 until learning that the offense charged required her to be under the age of eighteen. Hanke points out the offense date was extensively litigated at trial, with "both sides referring to school events and holidays that occurred during R.A.S.'s senior year in order to show that the alleged assault took place either before or after R.A.S.'s eighteenth birthday."

¶22 Hanke's argument demonstrates precisely why this is a classic jury question. R.A.S.'s credibility and how she came to recall the offense date was challenged by trial counsel on cross-examination and in closing argument. It is the jury's function to determine the credibility of the witnesses, reconcile inconsistent testimony, and to weigh the evidence. *Poellinger*, 153 Wis. 2d at 504, 506. If more than one inference can be drawn from the evidence, this court will follow the inference that supports the jury's finding "unless the evidence on which that inference is based is incredible as a matter of law." *Id.* at 506-07. On the evidence at trial, a reasonable juror could have found beyond a reasonable doubt that the assault occurred in September 2020, prior to R.A.S.'s eighteenth birthday.

*Other-Acts Evidence*

¶23 Hanke argues that the circuit court erroneously exercised its discretion in admitting the other-acts testimony of R.K.H., J.M.M., and D.A.W. Though character evidence is generally not admissible to show that the person acted in conformity therewith, evidence of a person's other crimes, wrongs or acts may be admitted for certain purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* WIS. STAT. § 904.04(2)(a). In determining whether other acts are admissible,

10

courts employ a three-part test: (1) the evidence must be offered for an acceptable purpose, (2) the evidence must be relevant, and (3) its probative value must not be substantially outweighed by the danger of unfair prejudice. *See State v. Sullivan*, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998). In child sexual assault cases, greater latitude is afforded the admissibility of other-acts evidence. *State v. Davidson*, 2000 WI 91, ¶51, 236 Wis. 2d 537, 613 N.W.2d 606.

¶24 The decision whether to admit or exclude other-acts evidence is left to the circuit court's sound discretion. *State v. Hunt*, 2003 WI 81, ¶34, 263 Wis. 2d 1, 666 N.W.2d 771. We will uphold its evidentiary ruling if the court "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *Id.*

¶25 The circuit court's decision to admit the other-acts testimony of R.K.H., J.M.M., and D.A.W. represents a proper exercise of discretion. The State sought to admit a variety of other acts, including testimony from eight former students. As to each proffered item, the court examined the particular facts, applied the *Sullivan* test, and came to a reasonable conclusion. With regard to five of the former students, the court acknowledged that their allegations shared facts in common with R.A.S.'s report but ruled them inadmissible because "after applying the Three-Step Analysis, there are sufficient differences in the facts as alleged" such that "unfair prejudice outweighs the probative value ...."[3] The court then determined "that to allow the additional [five] witnesses would cause

---

[3] The factual similarities mentioned by the circuit court included Hanke inviting the female students to his house, offering them alcohol, suggesting that they hang out naked in his hot tub, and engaging in awkward sexual conversations or borderline inappropriate physical contact.

confusion of the issues, be misleading to the jury, and would be needless presentation of cumulative evidence."

¶26 Applying the *Sullivan* test to the other-acts evidence concerning R.K.H., J.M.M., and D.A.W., and in light of the greater latitude rule, the circuit court reasonably ruled their testimony admissible. The court properly found that the evidence was offered for and relevant to a number of acceptable purposes. *See State v. Marinez*, 2011 WI 12, ¶25, 331 Wis. 2d 568, 797 N.W.2d 399 ("As long as the State and circuit court have articulated at least one permissible purpose for which the other-acts evidence was offered and accepted, the first prong of the *Sullivan* analysis is met."). Here, where Hanke was charged with a crime involving sexual contact, the evidence was, at a minimum, relevant to intent, motive, and absence of accident or mistake. *See State v. Hammer*, 2000 WI 92, ¶¶27-28, 236 Wis. 2d 686, 613 N.W.2d 629 (because sexual contact requires that the act be done for the purpose of sexual gratification, other-acts evidence is relevant to prove motive, intent, and lack of absence or mistake). Hanke's reported assaults on R.K.H., J.M.M., and D.A.W. were all similar to the crime charged in ways that were complex and distinct, and were therefore highly probative. *Sullivan*, 216 Wis. 2d at 786-87. Finally, the court reasonably determined "that the probative value in those three instances outweighs the danger of unfair prejudice to the defendant."

¶27 Hanke argues that the other-acts testimony was irrelevant because R.K.H., J.M.M., and D.A.W. all testified that they had graduated or turned eighteen before the conduct occurred. We disagree. Hanke's argument fails to recognize that whether the victim was a student and whether the victim was under eighteen at the time of the assault are not the only elements of the crime charged. The other-acts testimony was relevant to and highly probative of the first element,

whether Hanke had sexual contact with R.A.S. Additionally, all four victims were close in age when Hanke assaulted them and, like R.A.S., R.K.H. had not attained the age of eighteen.

¶28 Hanke also argues that the evidence was unduly prejudicial given the factual differences and because Hanke's conduct with R.K.H., J.M.M. and D.A.W. did not satisfy the elements of the crime charged. We are not persuaded. The circuit court applied the proper standard in determining that the high probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. *See State v. Linton*, 2010 WI App 129, ¶26, 329 Wis. 2d 687, 791 N.W.2d 222 ("The balancing test of the probative value and danger of unfair prejudice favors admissibility."). In addition, the court provided a cautionary instruction so as to "eliminate or minimize the potential for unfair prejudice." *Hammer*, 236 Wis. 2d 686, ¶36.

*Motion to Change Venue*

¶29 Hanke argues that the circuit court erred in denying his motion for a change in venue because prejudicial pretrial publicity precluded the possibility of an impartial jury. We review the court's denial of a change-of-venue motion under the erroneous exercise of discretion standard. *State v. Fonte*, 2005 WI 77, ¶12, 281 Wis. 2d 654, 698 N.W.2d 594. However, we independently evaluate the circumstances "to determine whether there was a reasonable likelihood of community prejudice prior to, and at the time of, trial and whether the procedures for drawing the jury evidenced any prejudice on the part of the prospective or empaneled jurors." *Id.* (citation omitted). The following factors are considered in evaluating pretrial publicity: "(1) the inflammatory nature of the publicity; (2) the timing and specificity of the publicity; (3) the degree of care exercised, and the

13

amount of difficulty encountered, in selecting the jury; (4) the extent to which the jurors were familiar with the publicity; (5) the defendant's utilization of peremptory and for cause challenges of jurors; (6) the State's participation in the adverse publicity; (7) the severity of the offense charged; and (8) the nature of the verdict returned." *Id.*, ¶31 (citation omitted).

¶30    Hanke's motion to change venue asserted that an impartial jury could not be had in Washington County because:  the publicity in his case was pervasive, appeared in a variety of media, and was inflammatory in nature; the school superintendent, members of the school board, and law enforcement participated in the publicity; the publicity contained some facts not admitted at trial; and the allegations against Hanke were serious.  The State filed an opposing response.

¶31    At a hearing on the motion, the circuit court stated it had reviewed the lengthy materials and complimented trial counsel "on the thoroughness of the motion, about 75 pages long."  After reciting and applying the relevant legal standards, the court denied the motion, finding in particular that the publicity was not inflammatory, that much of it was "more than a year old now[,]" and that the State did not participate "in adverse publicity in any way."  The court determined that any impartiality concerns could be addressed through voir dire and invited the attorneys to submit questions they wanted the judge to pose to potential jurors.

¶32    We conclude that the circuit court properly denied Hanke's motion to change venue.  It applied the proper legal standard to correct facts and made a reasonable decision.  Of particular import, the pretrial publicity reported objective factual information, such as the allegations in the complaint, that allegations had been brought by other individuals but could not be charged, and updates on

pretrial proceedings. *See Fonte*, 281 Wis. 2d 654, ¶32 (In evaluating whether pretrial publicity is inflammatory, "we note that objective, factual, non-editorial reporting is not prejudicial."). The reporting cannot be characterized as "rabble rousing" or as "attempt[ing] to influence public opinion against" Hanke. *See id.* at ¶¶32-33 (citation omitted). Further, nearly all of the articles submitted by Hanke were published more than a year before his trial, allowing "the memories and passions of the readers … to fade." *State v. Messelt*, 178 Wis. 2d 320, 330, 504 N.W.2d 362 (Ct. App. 1993).

¶33 Moreover, and critically important, the circuit court and the attorneys conducted a careful voir dire and "ensured an impartial jury." *Fonte*, 281 Wis. 2d 654, ¶37. The court and parties discussed how to question potential jurors at the change-of-venue hearing and again, as part of a jury status conference well in advance of trial. At voir dire, the court asked the potential jurors whether they "may know something about this case from any source; including newspaper, radio, social media, or television accounts," and the court discussed with those that answered in the affirmative whether they believed they could still be impartial, striking any potential juror who indicated they could not. The prosecutor revisited this issue with potential jurors, ensuring both that they understood that news reports are not evidence and that the publicity would not impact their ability to be impartial. The parties used three peremptory strikes to strike all but one juror who had been exposed to pretrial publicity.[4] In all, the circuit court and the parties "easily selected" the jury in this case, *see State v. Ritchie*, 2000 WI App 136, ¶27, 237 Wis. 2d 664, 614 N.W.2d 837, and the only empaneled juror with an

---

[4] Hanke used two peremptories and the prosecutor used one.

15

awareness of the pretrial publicity said that the exposure would not affect their ability to be impartial.

¶34    Hanke claims the news reports were inflammatory because they discussed the fact that other individuals had come forward with allegations, but those allegations could not be charged.   This information may have been unfavorable to Hanke, but that does not transform objective reporting of those facts into "rabble rousing."   Hanke also claims, without citation to any authority, that the community's memory of the initial media coverage would not have faded over the course of a year because Hanke was locally well known.   This argument is unpersuasive.   Moreover, only two potential jurors indicated that they knew Hanke and the circuit court struck both of them.

*By the Court.*—Judgment affirmed.

This opinion will not be published.   See WIS. STAT. RULE 809.23(1)(b)5.