STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Kelly R. FERGUSON, Defendant-Appellant.

Supreme Court

*No. 2007AP2095–CR. Oral argument December 16, 2008.
—Decided June 16, 2009.*

2009 WI 50

(Also reported in 767 N.W.2d 187.)

590

For the plaintiff-respondent-petitioner the cause was argued by *Maura F.J. Whelan,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there was a brief by *Jefren E. Olsen,* assistant state public defender, Madison, and oral argument by *Jefren E. Olsen.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review a decision of the court of appeals,[1] which reversed the circuit court's judgment[2] convicting Kelly R. Ferguson (Ferguson) of misdemeanor obstructing an officer pursuant to Wis. Stat. § 946.41(1) (2005–06).[3] The issue presented is whether the facts of this case required the circuit court to instruct the jury that in order for Ferguson to have violated § 946.41(1), the entry of Ferguson's home to arrest her for disorderly conduct was accompanied by exigent circumstances. Ferguson contends that because the police entered her home without a warrant and the jury was not instructed on exigent circumstances, there was no basis for the jury to find that the police acted with "lawful authority," as § 946.41(1) requires. We conclude that, even though a jury instruction on exigent circum-

---

[1] *State v. Ferguson,* No. 2007AP2095–CR, unpublished slip op. (Wis. Ct. App. Jan. 29, 2008).

[2] The Honorable Gregory B. Huber, Marathon County Circuit Court, presided.

[3] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

stances could have been given under the evidence presented to the jury, because Ferguson struggled with the officers outside of her home when she was in lawful custody of the police, the instruction given accurately set out the law for the officers' actions at that time. Therefore, if omitting an instruction on exigent circumstances was error, it was harmless error. Accordingly, we reverse the decision of the court of appeals and affirm the circuit court's judgment of conviction.

## I. BACKGROUND

¶ 2. On December 29, 2005, at around 4:30 in the morning, Wausau police responded to a report of an attempted break-in at a residence. When the police arrived, they spoke with the person who had telephoned, a tenant of the apartment building's lower floor, who complained that the upstairs tenant, Ferguson, had pounded on his door and threatened to evict him. The lower tenant explained that Ferguson was not the landlord and had no authority to evict him.

¶ 3. Following this interaction, the officers proceeded to Ferguson's apartment. They knocked on the door and Ferguson answered. They asked Ferguson if she had been downstairs earlier. The officers testified that she said "no," and then became belligerent, yelling and swearing at the officers. They said that while Ferguson was yelling, her nephew, also a resident of Ferguson's apartment, attempted to grab her arm and calm her down. The officers testified that Ferguson shoved her nephew at this point and that she directed profanities at him and told him to pack up his things and move out. Ferguson disputes this.

¶ 4. Until this time, the officers were outside of Ferguson's apartment, while Ferguson and her nephew were inside of the apartment. However, following

Ferguson's agitated conduct toward her nephew, the officers entered the apartment without a warrant and arrested Ferguson for misdemeanor disorderly conduct pursuant to Wis. Stat. § 947.01.[4] When the officers handcuffed Ferguson, she tried to pull her arm away, but was unable to do so. Ferguson was also resistive as the police attempted to get her socks on, and she continued to yell and scream.

¶ 5. The officers then escorted Ferguson out of her apartment. According to trial testimony, she continued to resist:

Q Was she cooperative with you going down the stairs?

A No. She would do shoulder shifts back and forth to try to either break free, then she was what we call dead weight tactics, where an individual goes limp, and then you have to struggle more to hold them up and so forth. This creates a danger for the individual and us, especially when they are going down a flight of stairs.

There was a point halfway through the stairs where she picked her legs up, kind of up in front of her, and started almost a bicycle motion with her feet, flailing her feet around.

Q How were her arms? Were they flailing about also?

A They [were] handcuffed, and we were holding them. I said there wasn't much she could do with her arms. Mostly it was an upper torso shift back and forth.

---

[4] Wisconsin Stat. § 947.01 states:

Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

. . . .

[W]hile she was kicking with her legs, I either got kicked with her foot or knee in the thigh. It was kind of like a charlie horse feeling as we continued down the stairs. Eventually we got her to the bottom of the stairs safely without anyone else getting injured.

Q During the taking her down the stairs, how would you characterize the defendant's demeanor, again using the one to ten level of volume?

A It was the same, ten.

Q Upon getting her to the bottom of the stairs, what then did you do?

A We escorted her to the car. The stairs are at the back of the residence. We picked the closest car, which happened to be in front by her driveway as we were parked across the street. We escorted her on the pavement along the driveway, and at the front of the house where the sidewalk and boulevard is, that's where [the] squad was parked, and we got her to the squad there.

. . . .

Q When you were taking her to that squad, what was the state of her pants?

A Well, we were kind of rushing her to the car because she was yelling and so forth. Her pants began to fall down, I suspect because of all the kicking she was doing. As we got to the rear of the squad, I still had her, ahold of her with one arm and began to try to pull up her trousers with my left hand, and she counteracted my efforts by kicking more to actually kick the pants off.

595

Ferguson was charged with disorderly conduct, obstructing an officer and two counts of battery by a prisoner.[5]

¶ 6. At trial, Ferguson requested that the circuit court use the following jury instruction for the "lawful authority" element of the obstruction charge:

> Police officers act with lawful authority if their acts are conducted in accordance with the law. In this case, it is alleged that while the police were investigating a complaint made against the defendant Kelly Ferguson by her downstairs neighbors and she got so loud and abusive toward the officers that they found it necessary to arrest her at her home.
>
> The police lack authority to make an arrest of a person in the person's home without a warrant unless exigent circumstances exist that require the arrest to take place immediately.
>
> In this case, the police did not have an arrest warrant.
>
> Exigent circumstances which justify a warrantless arrest inside the person's home, fall into four categories:
>
> A. The police were in hot pursuit of the defendant at the time of her arrest inside her home.
>
> B. The police had reason to believe evidence would be destroyed unless they made an arrest immediately[.]
>
> C. The defendant was likely to flee.
>
> D. The defendant was an immediate threat to the safety of others.

---

[5] The two counts of battery by a prisoner are based on events that took place while Ferguson was confined in the Marathon County Jail, and do not relate to our discussion here.

> If none of these circumstances [existed], the arrest was made without lawful authority[.]

The circuit court rejected Ferguson's proposed jury instruction, and instead instructed the jury as follows:

> Police officers act with lawful authority if their acts are conducted in accordance with the law. In this case, it is alleged that the officers were responding to and investigating a citizen complaint. During the course of doing so, the officers arrested the defendant.
>
> An arrest is lawful when the officer has reasonable grounds to believe that the person is committing, has committed, or is about to commit a crime. An officer making an arrest may only use the amount of force reasonably necessary to take the person into custody.

Having been read these instructions, the jury convicted Ferguson of disorderly conduct and obstruction.

¶ 7.　The court of appeals reversed Ferguson's conviction for obstruction. *State v. Ferguson*, No. 2007AP2095–CR, unpublished slip op., ¶ 11 (Wis. Ct. App. Jan. 29, 2008). It held that the jury instruction given by the circuit court for the lawful authority element of obstruction was an incorrect statement of the law. *Id.* Because Ferguson was arrested inside of her home without a warrant, the court of appeals focused only on Ferguson's conduct within her home and held that the police could be acting with lawful authority only if Ferguson's arrest was accompanied by "exigent circumstances." *Id.* Because the jury was not instructed on exigent circumstances, the court of appeals concluded that "it is not possible in this case to say that Ferguson was obstructing the officers *while* they acted with lawful authority." *Id.* (emphasis in original). The court of appeals reversed Ferguson's conviction and remanded the case for a new trial. *Id.*

¶ 8. We granted review and now reverse the court of appeals.

## II. DISCUSSION

### A. Standard of Review

■■■■

¶ 9. "[A] circuit court has broad discretion in deciding whether to give a particular jury instruction." *State v. Fonte,* 2005 WI 77, ¶ 9, 281 Wis. 2d 654, 698 N.W.2d 594. A circuit court properly exercises its discretion when it fully and fairly informs the jury of the law that applies to the charges for which a defendant is tried. *Id.* Whether a jury instruction fully and fairly informs the jury of the law applicable to the charges being tried is a question of law that we review independently. *Id.* (citing *State v. Groth,* 2002 WI App 299, ¶ 8, 258 Wis. 2d 889, 655 N.W.2d 163). If the jury instruction given was not an accurate statement of the applicable law, then the circuit court has erroneously exercised its discretion. *Peplinski v. Fobe's Roofing, Inc.,* 193 Wis. 2d 6, 23–24, 531 N.W.2d 597 (1995). We review whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the [instructional] error" as a question of law. *State v. Harvey,* 2002 WI 93, ¶ 46, 254 Wis. 2d 442, 647 N.W.2d 189.

### B. The Parties' Contentions

¶ 10. Ferguson challenges her conviction for obstruction, a violation of Wis. Stat. § 946.41(1). Section 946.41(1) provides: "Whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority, is guilty of a Class A misdemeanor."

¶ 11. The parties do not dispute that Ferguson was arrested inside of her home following a warrantless entry by police, and that the police had probable cause to arrest. Additionally, Ferguson does not dispute that the jury was properly instructed on all of the elements of obstruction other than "lawful authority."

¶ 12. The State argues that the officers acted in accordance with the law because they complied with Wis. Stat. § 968.07(1)(d), which states: "A law enforcement officer may arrest a person when: . . . [t]here are reasonable grounds to believe that the person is committing or has committed a crime." The State also argues that as long as police conduct is substantially in accordance with the law, the police act with "lawful authority." The State asserts that it is conceded that the police had probable cause to arrest; therefore, the arrest was lawful even though it was accomplished without a warrant and in Ferguson's home. The State also contends that exigent circumstances permitted the officers' entry into Ferguson's home.

¶ 13. By contrast, Ferguson contends that the State's interpretation of "lawful authority" has no support in the law. She asserts that her constitutional rights were violated by the police's entry of her home without a warrant. She also asserts that no exigent circumstances were present that could justify the unconstitutional entry, but even if the jury could have found that exigent circumstances were present, the jury was not instructed properly to make such a finding.

C. "Lawful Authority"

¶ 14. A central question before us is whether the jury instruction given accurately conveyed the meaning

of "lawful authority" under Wis. Stat. § 946.41(1) as applied to the facts of this case. Lawful authority describes whether the officer's actions are conducted in accordance with the law. *State v. Young,* 2006 WI 98, ¶ 76, 294 Wis. 2d 1, 717 N.W.2d 729; *State v. Annina,* 2006 WI App 202, ¶ 17, 296 Wis. 2d 599, 723 N.W.2d 708.

¶ 15. It is black letter law that a constitutional violation is an unlawful act. *See, e.g., Segura v. United States,* 468 U.S. 796, 829 (1984) (referring to Fourth Amendment violations as illegal conduct); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 146 (1984) (concluding that acts that violate the Constitution are illegal); *City of Milwaukee v. Kilgore,* 193 Wis. 2d 168, 189, 532 N.W.2d 690 (1995) (noting that a use of police power in violation of constitutional due process is unlawful); *State v. Smith,* 131 Wis. 2d 220, 235, 388 N.W.2d 601 (1986) (stating that an arrest in violation of the state or federal Constitutions is unlawful).

¶ 16. Accordingly, we reject the State's broad interpretation of lawful authority because "lawful authority," as that term is used in Wis. Stat. § 946.41(1), requires that police conduct be in compliance with both the federal and state Constitutions, in addition to any applicable statutes. *Smith,* 131 Wis. 2d at 235. Therefore, we determine whether principles of constitutional law relating to the officers' interactions with Ferguson required the circuit court to instruct the jury differently.

¶ 17. An arrest is a seizure invoking protections afforded under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the

Wisconsin Constitution.[6] Generally, if the police have probable cause to make an arrest, they do not need a warrant. *United States v. Watson*, 423 U.S. 411, 417–23 (1976); *West v. State*, 74 Wis. 2d 390, 398, 246 N.W.2d 675 (1976). However, when the police must enter a home to arrest, if they have not obtained a warrant in advance, the entry and arrest are presumptively unlawful. *Payton v. New York*, 445 U.S. 573, 586 (1980); *State v. Roberson*, 2006 WI 80, ¶ 31 n.12, 292 Wis. 2d 280, 717 N.W.2d 111; *State v. Hughes*, 2000 WI 24, ¶ 17, 233 Wis. 2d 280, 607 N.W.2d 621. This presumption is based on "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Payton*, 445 U.S. at 601. "Indeed, '[i]t is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *State v. Richter*, 2000 WI 58, ¶ 28, 235 Wis. 2d 524, 612 N.W.2d 29 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)).

██ ██

¶ 18. A warrantless arrest executed inside of a home may be presumptively unlawful because the *home*

---

[6] We generally have interpreted Article I, Section 11 to provide the same constitutional guarantees as the Supreme Court has accorded through its interpretation of the Fourth Amendment. *State v. Arias*, 2008 WI 84, ¶ 20, 311 Wis. 2d 358, 752 N.W.2d 748. On only one occasion in our development of Article I, Section 11 jurisprudence have we required a showing different from that required by the Supreme Court's Fourth Amendment jurisprudence. We did so in regard to our development of a good faith exception under Article I, Section 11. *State v. Eason*, 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625 (creating two additional requirements under Article I, Section 11 for law enforcement before according a good faith exception to their reliance on a defective no-knock search warrant). *Eason* has no application here.

*entry* itself is presumptively unlawful. *See Wong Sun v. United States,* 371 U.S. 471, 484 (1963) (concluding that based on the facts of that case, the arrest that followed an unlawful entry was unlawful). Acts subsequent to an unlawful entry, but while the police are inside of the home, also are presumptively unlawful because of the warrantless entry itself. *New York v. Harris,* 495 U.S. 14, 20 (1990) (reasoning that because police conduct subsequent to an unlawful entry and prior to exit of the home was unlawful, "a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home").

¶ 19.　However, not all warrantless home entries are unlawful. *Payton* merely states a presumption to which there are exceptions. For example, a home entry, though unaccompanied by a warrant, is lawful if "exigent circumstances" are present. *Payton,* 445 U.S. at 586–89; *Richter,* 235 Wis. 2d 524, ¶ 28 (concluding that the Fourth Amendment is not an absolute prohibition to a warrantless home entry); *Smith,* 131 Wis. 2d at 228 (concluding that exigent circumstances coupled with probable cause to arrest are sufficient to justify a home-based arrest conducted without a warrant). Exigent circumstances exist when "it would be unreasonable and contrary to public policy to bar law enforcement officers at the door." *Richter,* 235 Wis. 2d 524, ¶ 28; *see also Warden v. Hayden,* 387 U.S. 294, 298–300 (1967).

¶ 20.　The United States Supreme Court has recognized that exigent circumstances may be present in a number of different situations. *See, e.g., Michigan v. Tyler,* 436 U.S. 499, 509 (1978) (concluding that an ongoing fire was an exigent circumstance); *United States v. Santana,* 427 U.S. 38, 42–43 (1976) (holding that police in hot pursuit of a fleeing felon was an

exigent circumstance); *Hayden,* 387 U.S. at 298–99 (same); *Schmerber v. California,* 384 U.S. 757, 770–71 (1966) (concluding that imminent destruction of evidence was an exigent circumstance). As we have explained:

> [t]here are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: 1) hot pursuit of a suspect, 2) a threat to the safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee.

*Richter,* 235 Wis. 2d 524, ¶ 29 (citing *Smith,* 131 Wis. 2d at 229). The State bears the burden of proving that a warrantless home entry is justified by exigent circumstances. *Id.*

¶ 21. The exclusionary rule, which, if applied to unlawful police conduct, results in suppression of evidence obtained as a result of a constitutional violation, was developed in part to foster compliance with the Fourth Amendment's concern for the sanctity of the home. *United States v. Crews,* 445 U.S. 463, 474 (1980). Suppression is the usual remedy for a Fourth Amendment violation. *Id.*

¶ 22. The arrest and subsequent prosecution are not themselves invalidated, even though the initial entry may have been unlawful, so long as there was probable cause for the arrest. *Id.* As the United States Supreme Court explained in *Crews:*

> [A defendant] cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without

603

more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.

*Id.* (further citations omitted).

¶ 23. However, Ferguson is not moving for suppression of any evidence, nor does she challenge her conviction for disorderly conduct. She challenges her conviction for obstruction because a substantive element of obstruction is whether the police were acting pursuant to their "lawful authority," as Wis. Stat. § 946.41(1) requires. Ferguson focuses her attention solely on police conduct within her home, which she asserts was unlawful because the police entered without a warrant. The State counters that the police were lawfully within her home because they entered due to the exigent circumstance of a threat to the safety of her nephew.

¶ 24. One of the officers testified as follows regarding the situation observed just outside Ferguson's door immediately prior to their warrantless home entry to arrest her:

> When I was up at the door, next to [Ferguson], she was just waving her hands, pointing at me. I smelled an odor of intoxicants from—what I believe were intoxicants, based on my experience. Again, because she didn't seem to respond to my request to calm down, within or after the first couple minutes or a minute or so [the other officer] stepped up to see if he could calm her down.

The other officer testified that immediately prior to entry:

> I don't recall if she picked up a phone book or a telephone or something. But then the young gentleman we identified as her nephew . . . was coming behind her. He was saying Auntie, Auntie, and he went to grab her and bring her back a little bit, to compose her, I believe, and that's when she pushed him out of the way and started

604

> swearing and yelling at him, telling him to pack his F'ing stuff and he can move out, too.
>
> . . . .
>
> [B]ased on our encounter with her and her conduct and how she treated [her nephew] and pushed him, even in our presence, I determined it wouldn't be a good idea to just leave the situation and go back to the [police department]. I determined I was going to arrest her for disorderly conduct, at least so she can sober up for the night in the jail and not cause [her nephew] any harm after we leave.

¶ 25. The State argues that clearly exigent circumstances were present that justified their warrantless entry. However, the extent to which law enforcement is permitted to rely on exigent circumstances for a warrantless entry of a home has a relationship to the seriousness of the offense. As the United States Supreme Court explained in *Welsh,* where "the underlying offense for which there is probable cause to arrest is relatively minor," courts should be very hesitant to find exigent circumstances. *Welsh,* 466 U.S. at 750. That is, "[w]hen the government's interest is only to arrest for a minor offense, . . . the government usually should be allowed to make such arrest[] only with a warrant issued upon probable cause by a neutral and detached magistrate." *Id.* The rationale for this holding is that the general presumption that police conduct accompanied by probable cause is reasonable is lessened when the underlying offense is minor.[7] *Id.* at 750.

---

[7] Justice Bradley attempts to show that *Welsh v. Wisconsin,* 466 U.S. 740 (1984), is contrary to the position that the majority of the court takes with regard to our discussion of the officers' entry into Ferguson's home. Justice Bradley's concurrence, ¶ 51

¶ 26. We acknowledge the distinction recognized in *Welsh,* and note that this distinction causes us to address *State v. Mikkelson,* 2002 WI App 152, 256 Wis. 2d 132, 647 N.W.2d 421. In *Mikkelson,* the court of appeals interpreted *Welsh* and *Santana* to impose a bright-line rule that police are justified in making a warrantless entry into a home only where the legislature had labeled the underlying offense as a felony. *Mikkelson,* 256 Wis. 2d 132, ¶ 17. Because the underlying offense in *Mikkelson* was a misdemeanor, the court of appeals held that any exigent circumstances present were insufficient to justify the police's warrantless entry into Mikkelson's home. *Id.*

¶ 27. Our review of the reasoning of *Mikkelson,* as compared with that of *Welsh* and *Santana,* causes us to overrule *Mikkelson* and to adopt Justice Prosser's concurrence in *State v. Sanders,* 2008 WI 85, 311 Wis. 2d 257, 752 N.W.2d 713. As Justice Prosser noted, *Welsh* and *Santana* did not create a bright-line rule requiring the underlying offense to be labeled a felony in order for exigent circumstances to justify a warrantless home entry.[8] *Id.,* ¶ 71 (Prosser, J., concurring). Instead,

---

n.2. However, *Welsh* does not support the position she takes. In *Welsh,* the officers did not know whether Welsh had a prior OMVWI such that the OMVWI on which the officers were proceeding would have been a subsequent, and therefore jailable, offense. *Welsh,* 466 U.S. at 746 n.6 (explaining that "the police conducting the warrantless entry of his home did not know that the petitioner had ever been charged with, or much less convicted of, a prior violation for driving while intoxicated"). In the case now before us, the officers had objective facts upon which a reasonable officer could conclude that Ferguson was guilty of criminal disorderly conduct, a jailable offense. Wis. Stat. § 947.01.

[8] Ferguson asserts that *State v. Mikkelson,* 2002 WI App 152, 256 Wis. 2d 132, 647 N.W.2d 421, need not be discussed

*Welsh* held that the gravity of the underlying offense is "an important factor to be considered when determining whether any exigency exists," *Welsh,* 466 U.S. at 753, and that where the underlying offense is "a noncriminal, civil forfeiture offense for which no imprisonment is possible," exigent circumstances will rarely, if ever, be present, *id.* at 754.

¶ 28. *Welsh* does not create a felony/misdemeanor distinction for finding exigent circumstances, contrary to the holding in *Mikkelson.* Instead, in determining the extent to which the underlying offense may support a finding of exigency, "the critical factor ... is ... 'the penalty that may attach.' " *Sanders,* 311 Wis. 2d 257, ¶ 81 (Prosser, J., concurring) (quoting *Welsh,* 466 U.S. at 754 n.14). We reach this conclusion since the penalty imposed for an offense " 'provide[s] the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense.' " *Id.* (quoting *Welsh,* 466 U.S. at 754 n.14).

here, since its rule arguably applies only to the exigent circumstance of "hot pursuit," and the potentially applicable exigent circumstance in this case would be "a threat to the safety of a suspect or others." *See State v. Richter,* 2000 WI 58, ¶ 29, 235 Wis. 2d 524, 612 N.W.2d 29. We disagree. *Mikkelson* based its felony/misdemeanor distinction on the United States Supreme Court's decisions in both *Welsh* and *United States v. Santana,* 427 U.S. 38 (1976). While *Santana was* a "hot pursuit" case, *Santana,* 427 U.S. at 42–43, *Welsh* dealt with the exigent circumstance present when there is a risk that evidence will be destroyed, *Welsh,* 466 U.S. at 754. *See Richter,* 235 Wis. 2d. 524, ¶ 29. As a result, because of its reliance on *Welsh, Mikkelson* is not necessarily limited to "hot pursuit," and arguably may be read to apply its felony/misdemeanor distinction to all types of exigent circumstances. Therefore, though Ferguson has not expressly relied on *Mikkelson* here, it is nevertheless appropriate for us to address it in this case.

¶ 29. Accordingly, courts, in evaluating whether a warrantless entry is justified by exigent circumstances, should consider whether the underlying offense is a jailable or nonjailable offense, rather than whether the legislature has labeled that offense a felony or a misdemeanor. To hold otherwise would allow "the perpetrator of a serious misdemeanor offense, for which jail time is a penalty, to avoid immediate arrest merely because of the label ('felony' or 'misdemeanor') chosen by the legislature." *Id.*, ¶ 93 (citation omitted). Such a result is not mandated by *Welsh*.

¶ 30. Our interpretation of *Welsh* is supported by the United States Supreme Court's explanation of *Welsh* in *Illinois v. McArthur,* 531 U.S. 326, 335–36 (2001), where it explained that "*Welsh* drew a distinction between jailable and nonjailable offenses, not between felony and misdemeanor offenses."[9] *Sanders,* 311 Wis. 2d 257, ¶ 83 (Prosser, J., concurring) (citing *McArthur,* 531 U.S. at 335–36). Furthermore, many other jurisdictions have interpreted *Welsh* consistent with our interpretation here. *See, e.g., People v. Lavoyne M.,* 270 Cal. Rptr. 394, 395–96 (Ct. App. 1990) (rejecting a proposed distinction between misdemeanors and felonies); *Mendez v. People,* 986 P.2d 275, 283 (Colo. 1999)

---

[9] Justice Bradley characterizes our overruling of *Mikkelson* as "an unbridled exercise of power." Justice Bradley's concurrence, ¶ 47. Her phraseology is really code words for not wanting the majority of the court to comply with the directive of the United States Supreme Court by overruling a published Wisconsin case that has incorrectly interpreted a United States Supreme Court case. We conclude that due to the law-declaring function of this court, it is our responsibility to overrule *Mikkelson*'s incorrect interpretation.

(holding that exigent circumstances can justify a warrantless entry even though the underlying offense is a misdemeanor); *Dyer v. State,* 680 So. 2d 612, 613 (Fla. Dist. Ct. App. 1996) (holding that misdemeanor possession of marijuana was a much more serious offense than the civil forfeiture offense in *Welsh,* and weighed in favor of exigency); *Threatt v. State,* 524 S.E.2d 276, 280 (Ga. Ct. App. 1999) (noting that the gravity of the underlying offense, not the label the legislature has given it, is the appropriate focus of inquiry); *State v. Legg,* 633 N.W.2d 763, 769–70, 773 (Iowa 2001) (noting that the distinction in *Welsh* is based on the penalty that attaches to the offense); *State v. Paul,* 548 N.W.2d 260, 267–68 (Minn. 1996) (noting that the distinction in *Welsh* is based not on the offense's label, but on whether the offense "is classified as a *criminal offense* for which imprisonment is possible") (emphasis in original); *City of Kirksville v. Guffey,* 740 S.W.2d 227, 228–29 (Mo. Ct. App. 1987) (holding that misdemeanor drunk driving justified a finding of exigency); *State v. Nikola,* 821 A.2d 110, 117–18 (N.J. Super. Ct. App. Div. 2003) (noting that *Welsh* distinguished between jailable and nonjailable offenses, not misdemeanors and felonies); *People v. Odenweller,* 527 N.Y.S.2d 127, 129–30 (App. Div. 1988) (holding that misdemeanor drunk driving justified a finding of exigency); *Beaver v. State,* 106 S.W.3d 243, 248–49 (Tex. App. 2003) (noting that *Welsh* distinguished between jailable and nonjailable offenses, not misdemeanors and felonies); *Cherry v. Commonwealth,* 605 S.E.2d 297, 306–07 (Va. Ct. App. 2004) (same); *Rideout v. State,* 122 P.3d 201, 210 (Wyo. 2005) ("[T]he distinction drawn by the Court in *Welsh* between minor offenses that do not justify a warrantless entry into a residence and those offenses that do is predicated upon

609

whether the subject offense carries a potential jail term."). Accordingly, because the disorderly conduct with which Ferguson was charged was a jailable offense, the jury could have been permitted to decide whether exigent circumstances justified the police's warrantless entry into her home.[10]

## D. Jury Instruction

¶ 31. Because "lawful authority" is an element of obstruction under Wis. Stat. § 946.41(1), if the jury was not properly instructed on the meaning of "lawful authority," given the facts presented to the jury, the circuit court erred. *See Harvey*, 254 Wis. 2d 442, ¶ 23 ("[J]ury instructions that have the effect of relieving the State of its burden of proving beyond a reasonable doubt every element of the offense charged are unconstitutional under the Fifth and Sixth Amendments.").

¶ 32. Ferguson engaged in a course of conduct wherein she struggled with the officers, both *inside* and *outside* of her home, which the jury could have found obstructed the police. Inside her home, Ferguson resisted the officers when they attempted to put her in handcuffs, and she was uncooperative when they tried to put on her socks. The parties seem to agree that if the

---

[10] We acknowledge the valid concern of the concurrences that the distinction between a jailable offense and a non-jailable offense may not provide a bright line for law enforcement officers under all possible circumstances. Justice Bradley's concurrence, ¶ 54; Justice Crooks' concurrence, ¶ 78. However, the distinction between a misdemeanor and a felony also does not provide a bright line for officers considering whether to enter a person's home without a warrant under all circumstances, and that distinction is not supported by United States Supreme Court precedent.

jury found that this conduct violated Wis. Stat. § 946.41(1), the police must have had exigent circumstances in order for them to be acting with lawful authority at that time.

¶ 33. The parties also agree that the only exigent circumstance the jury could have found at the time the police entered Ferguson's home would have been that Ferguson was a threat to the safety of her nephew. *See Richter,* 235 Wis. 2d 524, ¶ 29. In that regard, Ferguson, who had been drinking, became abusive toward her nephew when he attempted to take her arm to calm her. This occurred immediately preceding the officers' entry into her home. If the jury needed to find that this exigent circumstance existed in order to find that the police acted with lawful authority, no instruction was provided to alert the jury of this concern. If that instruction had been necessary, failure to give it would have been error, subject to a harmless error analysis. *Harvey,* 254 Wis. 2d 442, ¶ 37.

¶ 34. However, when Ferguson was removed from her home, she continued to struggle with the officers. She used "dead weight tactics," going limp as the officers attempted to move her, and she flailed her legs going down the stairs. She kicked at least one of the officers. In addition, she was resistive as the officers placed her in the squad car, and flailed her legs again, kicking her pants off.

¶ 35. In regard to actions that occurred outside of Ferguson's apartment, the question becomes whether the police were acting with lawful authority as they escorted her down the apartment building stairway and placed her inside the squad car. We conclude that the jury must have decided that the police were acting with lawful authority. In so concluding, we rely on the reasoning of the United States Supreme Court in *Harris.*

¶ 36. In *Harris,* the police had probable cause to arrest Harris for the murder of Thelma Staton. They went to Harris' home and entered with the plan to arrest him; however, they did not obtain a warrant prior to doing so. *Harris,* 495 U.S. at 15. Once inside Harris' home, they read him his *Miranda* warnings,[11] and according to the officers, he confessed to the murder. *Id.* at 16. Subsequent to his arrest, Harris was taken to the station house and again read his *Miranda* warnings. *Id.* At the station house, he signed a confession to the murder. *Id.* The trial court suppressed the in-home confession as violative of *Payton* because police had entered Harris' home to arrest him without a warrant, but concluded that the station house confession was admissible. *Id.* After the appellate division affirmed, the New York Court of Appeals reversed, concluding that the station house confession should have been suppressed as well. *Id.* Before the Supreme Court, the state did not contest the suppression of the in-home confession; it contested only the suppression of the station house confession. *Id.*

¶ 37. The Supreme Court overruled the suppression of the station house confession, reasoning that nothing in *Payton* "suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house." *Id.* at 18. The Court went on to explain that a warrantless arrest based on probable cause also did not require the police to release Harris and then immediately re-arrest him once they had removed him from his home in order to make his transportation to the station house lawful. *Id.*

[11] *Miranda v. Arizona,* 384 U.S. 436 (1966).

¶ 38. The Supreme Court explained that the lawfulness of police custody of Harris differed from cases such as *Taylor v. Alabama,* 457 U.S. 687 (1982), *Dunaway v. New York*, 442 U.S. 200 (1979) and *Brown v. Illinois,* 422 U.S. 590 (1975), because in each of those cases the entry was without a warrant and the police also lacked probable cause to arrest. *Harris,* 495 U.S. at 18–19. Because the police had probable cause to arrest Harris, the statement given at the station house was given while Harris was in lawful custody.

■■

¶ 39. The reasoning and conclusions of *Harris* are applicable to Ferguson's struggles while the police were escorting her down the apartment stairs and placing her into the squad car. This is so because the police had probable cause to arrest Ferguson for disorderly conduct so that she was lawfully in their custody. Once Ferguson was removed from her house, the police were not required to re-arrest her for disorderly conduct in order to make her continued custody lawful. Therefore, her continuing struggles outside of her home occurred when the police were lawfully transporting her to the station house.

¶ 40. Our conclusion in this regard is supported by other courts that have considered the issue of whether continued custody subsequent to an arrest based on probable cause is lawful, even though the defendant was not arrested in a lawful manner. *See United States v. Hudson,* 405 F.3d 425, 439 (6th Cir. 2005) ("[*Harris*] emphasized that although the manner of the defendant's arrest was unconstitutional, his continued custody—supported by probable cause—was not unlawful and he could not claim 'immunity from prosecution because his person was the fruit of an illegal arrest.' "); *United States v. Villa-Velazquez,* 282

F.3d 553, 556 (8th Cir. 2002) (holding that, because law enforcement officers had probable cause to arrest the defendant, "the evidence obtained during the time that [the defendant] was in lawful custody" should not be suppressed because of "the earlier unlawful entry into his residence"); *Torres v. State,* 619 A.2d 566, 569 (Md. Ct. Spec. App. 1993) ("Once the suspect is outside the protected premises, . . . the initially invalid restraint ripens into valid restraint."); *Roberson,* 287 Wis. 2d 403, ¶ 16 (noting that "the *Harris* court distinguished *Payton* as protecting the home itself, not the defendant's person, and, as a result, Harris' confession made outside of the home was admissible").

¶ 41. As we noted above, although the jury was not instructed about exigent circumstances, it did receive an instruction on lawful authority. The circuit court instructed:

> Police officers act with lawful authority if their acts are conducted in accordance with the law. In this case, it is alleged that the officers were responding to and investigating a citizen complaint. During the course of doing so, the officers arrested the defendant.

> An arrest is lawful when the officer has reasonable grounds to believe that the person is committing, has committed, or is about to commit a crime. An officer making an arrest may only use the amount of force reasonably necessary to take the person into custody.

¶ 42. The jury necessarily found that there were reasonable grounds to believe Ferguson was committing or had committed a crime because it convicted Ferguson of obstruction. In order to do so, the jury also had to find that the officers acted pursuant to their lawful authority. That is, under the instruction given, the jury must have found that the officers acted pursu-

ant to their lawful authority if it found that the officers had reasonable grounds to believe that Ferguson was committing or had committed a crime. Because the jury convicted Ferguson, it found this fact. *Drabek v. Sabley,* 31 Wis. 2d 184, 188, 142 N.W.2d 798 (1966) (noting that a jury impliedly finds underlying facts if those facts are necessary to the ultimate fact of guilt or innocence).

¶ 43. The jury instruction here was a correct statement of the law for police actions outside of Ferguson's home. Therefore, although one may argue that the jury instruction was incomplete because it did not instruct on exigent circumstances, it did instruct relative to the actions of the police in arresting Ferguson once they were outside of her home where she continued her resistive course of conduct.

¶ 44. It is true that a jury instruction that is incomplete, but is in all other respects a correct statement of the law, may be erroneous. *See State v. Perkins,* 2001 WI 46, ¶ 43, 243 Wis. 2d 141, 626 N.W.2d 762 (concluding that the jury instruction was erroneous because it failed to adequately define the element of "threat" for the offense of intentional threat to a judge); *see also Rose v. Clark,* 478 U.S. 570, 579–80 (1986) (explaining that a jury instruction was erroneous because, while it did instruct the jury on the "malice" element of the charged offense, it erroneously shifted the burden of proof). However, here any incompleteness in the instruction did not fail to define lawful authority.

¶ 45. Based on the test set forth in *Harvey,* we conclude that if the failure to instruct the jury on exigent circumstances was error, it was harmless. Under *Harris,* the police were acting with lawful authority in continuing their arrest of Ferguson as they escorted

her down the apartment building stairway and placed her in the squad car. Ferguson did not discontinue her resistive conduct when police removed her from her home. As a result, we can conclude that if the jury had been instructed on exigent circumstances as well as the instruction given, it is clear beyond a reasonable doubt that the jury would have convicted Ferguson of obstruction. *Harvey,* 254 Wis. 2d 442, ¶ 48.

### III. CONCLUSION

¶ 46. We conclude that, even though a jury instruction on exigent circumstances could have been given under the evidence presented to the jury, because Ferguson struggled with the officers outside of her home when she was in lawful custody of the police, the instruction given accurately set out the law for the officers' actions at that time. Therefore, if omitting an instruction on exigent circumstances was error, it was harmless error. Accordingly, we reverse the decision of the court of appeals and affirm the circuit court's judgment of conviction.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 47. ANN WALSH BRADLEY, J. *(concurring).* The majority exhibits an unbridled exercise of power. What I mean by that phrase is that the majority ignores the normal restraints of an appellate court such as following precedent and letting the parties frame and argue the issues. Instead, it unnecessarily reaches out to overrule a prior decision that even the State acknowledges "was never raised" previously and "is not part of this case." Why does the majority do this? Because it can.

¶ 48. I write separately because I cannot join the majority in overruling *State v. Mikkelson,* 2002 WI App

152, 256 Wis. 2d 132, 647 N.W.2d 421. As enunciated in the concurrence of Justice Crooks, not only is it unwarranted but the test the majority adopts in its stead is unworkable. Although I agree with the result of the majority, that the court of appeals should be reversed and the conviction affirmed, I do so based on a different rationale. Accordingly, I respectfully concur.[1]

I

¶ 49. In *Mikkelson,* the court of appeals determined that hot pursuit of a fleeing misdemeanant was not by itself sufficient to justify a warrantless home entry. *Id.,* ¶ 17. The holding in *Mikkelson* is not at issue here given that hot pursuit is not an issue in this case.

¶ 50. Ferguson has never relied on *Mikkelson* and has never argued that the officers' home entry was unlawful because disorderly conduct is a misdemeanor. Instead, Ferguson has consistently asserted that the home entry was lawful only if she posed a threat to the safety of herself or her nephew, and it was necessary for the jury to decide whether that exigent circumstance was present.

¶ 51. Neither party cited *Mikkelson* at the circuit court or at the court of appeals. Further, both parties agree that it is not necessary for this court to address *Mikkelson* in order to resolve this appeal. Ferguson argues that *Mikkelson* is irrelevant because its holding is limited to hot pursuit, and this case involves a different exigency. At oral argument, the State agreed that *Mikkelson* need not be addressed: "If Ferguson's conviction is affirmed, as [defense] counsel points out,

---

[1] In addition, I join Part II of Justice Crooks' concurrence.

the *Mikkelson/Sanders*[2] issue was never raised and therefore it is not part of the case."

¶ 52. The State is correct. The majority's discussion of *Mikkelson* is a wholly unnecessary detour, and only after reaching out to overrule the case does the majority return to the real issue presented—whether the jury instruction that was actually given was erroneous.

¶ 53. What makes the majority's overreach even worse is that it does not deal with some trifling, penny-ante issue. Rather, it dilutes the protections guaranteed to all of us by the Fourth Amendment of the United States Constitution.

II

¶ 54. I agree wholeheartedly with Justice Crooks' prediction that the majority's new test for exigent circumstances—whether the offense is jailable—is unworkable. His concurrence expresses doubt "that a law enforcement officer will easily be able to determine, perhaps in the middle of the night, and certainly without the knowledge of what offense the prosecuting authority will ultimately decide to charge, whether the offense involved 'is a jailable or nonjailable offense.' " Justice Crooks' concurrence, ¶ 79.

¶ 55. This very case demonstrates the difficulties presented by the majority's approach. The majority concludes that "because the disorderly conduct with which Ferguson was charged was a jailable offense, the jury could have been permitted to decide whether exigent circumstances justified the police's warrantless entry into her home." Majority op., ¶ 30.

---

[2] *State v. Sanders,* 2008 WI 85, 311 Wis. 2d 257, 752 N.W.2d 713.

¶ 56. In this case, however, it is not at all clear that the officers were arresting Ferguson for a jailable offense. The majority miscites the record when it states that City of Wausau police officers entered Ferguson's apartment to arrest her "for misdemeanor disorderly conduct pursuant to Wis. Stat. § 947.01." *See* majority op., ¶ 4. In fact, Officer Taylor, who made the decision to arrest, testified that he decided to take Ferguson into custody in order to let her sober up and calm down:

> I determined it wouldn't be a good idea to just leave the situation and go back to the P.D. I determined that I was going to arrest her for disorderly conduct, at least so she can sober up for the night in the jail and not cause [her nephew] any harm after we leave.

It is unclear whether at the time of the arrest for disorderly conduct, Officer Taylor intended for Ferguson to be charged with a crime or any offense at all.

¶ 57. If charged, it just as easily could have been for a civil forfeiture rather than a misdemeanor, but for Ferguson's post-arrest conduct. The Wausau Ordinances provide that the penalty for disorderly conduct is "a forfeiture of not less than ten dollars nor more than two hundred dollars for each offense." Wausau Municipal Code §§ 1.01.110, 9.04.010. Under the Marathon County Ordinances, the penalty for first offense disorderly conduct is "not less than $5.00 nor more than $500.00." Marathon County Ordinances § 25.04; *see also id.* §§ 9.01, 9.15. Neither the city nor the county ordinance provides that disorderly conduct is a jailable offense.

¶ 58. I predict, along with Justice Crooks, that law enforcement will labor under the uncertainty of the majority's newly contrived test. As city police officers step over the threshold to arrest for disorderly conduct,

how are they to know if conduct will subsequently be charged as a jailable or nonjailable offense?[3] When officers have to act in the middle of the night under split-second circumstances, how can we expect them to make these nuanced decisions? I conclude that the test is unworkable.

## III

¶ 59. After taking a detour to change Wisconsin law and decide issues that are wholly irrelevant to this case, the majority finally returns to the real question presented—whether the jury instruction properly described the law. *See* majority op., ¶¶ 31–45. It undertakes a contorted analysis, relying on language from *New York v. Harris,* 495 U.S. 14 (1990).

¶ 60. Yet, *Harris* is a very different case from the one presented here. In that case, pursuant to a "departmental policy" of arresting suspects at home but without a warrant, officers unlawfully entered Harris's home to arrest him for murder. *Id.* at 15–16; *see also id.* at 25 (Marshall, J., dissenting). They interviewed him inside the home, and Harris confessed. *Id.* at 16. The officers then transported him to the police station

---

[3] The United States Supreme Court grappled with a similar concern in *Welsh v. Wisconsin,* 466 U.S. 740, 746 n.6 (1984):

> The petitioner was charged with a criminal misdemeanor because this was his second . . . citation [for what would otherwise be a civil forfeiture] in the previous five years. Although the petitioner was subject to a criminal charge, the police conducting the warrantless entry of his home did not know that the petitioner had ever been charged with, or much less convicted of, a prior violation for driving while intoxicated. It must be assumed, therefore, that at the time of the arrest the police were acting as if they were investigating and eventually arresting for a nonjailable traffic offense that constituted only a civil violation under the applicable state law.

where he confessed again. *Id.* The question was whether the stationhouse confession should be suppressed because it was the product of an illegal arrest. The Supreme Court concluded that the stationhouse confession to murder was not itself the product of an illegal arrest and therefore need not be suppressed. *Id.* at 19. Here, however, Ferguson is not seeking to suppress any evidence.

¶ 61. The *Harris* opinion is not without controversy. It is viewed under certain fact situations as creating powerful incentives for officers to ignore Fourth Amendment protections. Not all courts have clamored to embrace its holding. For instance, when *Harris* was remanded by the Supreme Court to the New York Court of Appeals, the New York court refused to conclude that the stationhouse confession was admissible. *See People v. Harris,* 570 N.E. 2d 1051 (N.Y. 1991). Rather, the New York court determined that "the Supreme Court's rule does not adequately protect the search and seizure rights of citizens of New York," and that even if the confession was admissible under federal standards, the New York State Constitution required its suppression. *Id.* at 1052–53.

¶ 62. Ferguson claims that the error here is that the circuit court failed to give the correct jury instruction. One element of obstruction is that the police were acting with "lawful authority." Wis. Stat. § 946.41. Ferguson asserts that the court should have instructed the jury on the law of exigent circumstances so it could determine whether the State proved that element. She has consistently argued that if the entry and therefore arrest for disorderly conduct were unlawful, then she could not be prosecuted for obstruction.

¶ 63. I conclude, however, that even if the entry and arrest for disorderly conduct were unlawful, the

obstructing was sufficiently separate in time and location from any potentially unlawful conduct by the police. *See State v. Annina*, 2006 WI App 202, ¶ 11, 296 Wis. 2d 599, 723 N.W.2d 708 (citing with approval *United States v. Bailey*, 691 F.2d 1009, 1017–18 (11th Cir. 1982)) ("[T]he police may legally arrest a defendant for a new, distinct crime, even if the new crime is in response to police misconduct and causally connected thereto.").

¶ 64. The obstruction for which Ferguson was charged was a distinct crime from the disorderly conduct charge, and was based on distinct conduct that occurred outside of her home. Admittedly during the course of the trial there was some reference to her resistance in the home.[4] What is clear, however, is that the obstruction that occurred outside the home was paramount.

¶ 65. Officers Taylor and Cihlar, who made the initial and allegedly unlawful arrest, testified that they escorted Ferguson out of her apartment and into a waiting squad car. At that point, the officers testified that she actively and aggressively resisted their attempts to bring her into custody.

¶ 66. Officer Taylor testified that she physically resisted when they escorted her down the exterior staircase of the apartment building:

Q: Was she cooperative with you going down the stairs?

---

[4] Specifically, Officer Taylor testified, "[I] grabbed onto her arm. As she turned around, at this point I think it was her right arm, and she tried to shake it loose, but she couldn't." Additionally, the officers testified that she was slow and "picky" about which socks she wanted to wear. Unfortunately, neither the court nor the attorneys sought to clarify whether these minor references also served to support the factual basis of the obstruction charge. The real focus of the testimony establishing obstruction, however, was the testimony about the aggravated conduct that occurred while she was outside the apartment.

A: No. She would do shoulder shifts back and forth to try to either break free, then she was what we call dead weight tactics, where an individual goes limp and then you have to struggle more to hold them up and so forth. This creates a danger for the individual and us, especially when they are going down a flight of stairs.

There was a point halfway through the stairs where she picked her legs up, kind of up in front of her, and started almost a bicycle motion with her feet, flailing her feet around.

. . . .

She was flailing around, using dead weight tactics, and part of the way, while she was kicking with her legs, I either got kicked with her foot or knee in the thigh. It was kind of like a charlie horse feeling as we continued down the stairs. Eventually we got her to the bottom of the stairs safely without anyone else getting injured.

¶ 67. He also testified that Ferguson obstructed the officers when they tried to place her in the squad car:

[W]e were kind of rushing her to the car because she was yelling and so forth. Her pants began to fall down, I suspect because of all the kicking she was doing. As we got to the rear of the squad, I still had her, ahold of her with one arm and began to try to pull up her trousers with my left hand, and she counteracted my efforts by kicking more to actually kick the pants off. She yelled, "Look at this. Wausau PD is stripping me down on the street," and said something like she is going to tell everything, we stripped her down. I just opened the door at that point and put her in the car.

Officer Cihlar testified that she had been kicking, twisting around, and yelling, and by the time they arrived at the squad car, her pants were at her ankles.

623

He testified that they "tried numerous times to have her pants up and keep them up, but she seemed determined to resist that, and so we had her seated in the squad as she was."

¶ 68. Additionally, Officer Taylor testified that Ferguson continued to resist once she had been placed in the squad car. He testified that at one point, she freed herself from her handcuffs. Further:

> [I was approximately 90 feet away from the squad car, and from that distance] I could hear thumping in the back of the squad, which is familiar to me as someone kicking the back of the cage, or the inner door area, as well as her yelling. That got my attention.

¶ 69. This conduct bears no relation to the purportedly unlawful entry for disorderly conduct. After the arrest, and after she was transported outside by the officers, Ferguson obstructed the officers by kicking, using dead weight tactics, and removing her clothing. This obstruction was a new and distinct crime. Under these facts, even if the initial arrest for disorderly conduct was unlawful, that cannot immunize Ferguson for prosecution for the second, separate crime.

¶ 70. The jury instruction for obstructing an officer given by the circuit court advised that officers act with "lawful authority" when they have probable cause to believe that a crime is, has been, or is about to be committed. Ferguson argues that the circuit court erred by failing to give a jury instruction defining "lawful authority" in the context of exigent circumstances which could make lawful the officers' warrantless entry for disorderly conduct. I conclude that the circuit court gave the proper instruction.

¶ 71. Here, the crime of obstructing an officer is a new and distinct crime. Additionally, both the conduct

624

underlying the obstruction charge and the location of where the obstructing conduct occurred support the conclusion that the obstruction is separate from the warrantless entry of the apartment for disorderly conduct. Accordingly, I respectfully concur.

¶ 72. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice N. PATRICK CROOKS join this concurrence.

¶ 73. N. PATRICK CROOKS, J. (*concurring*).

I

¶ 74. Since I am convinced that the majority opinion is correct that "if the failure to instruct the jury on exigent circumstances was error, it was harmless," majority op., ¶ 45, *see also* ¶ 1, I join that part of the opinion and respectfully concur.

¶ 75. The appropriate test for harmless error is set forth in *State v. Harvey,* 2002 WI 93, ¶¶ 49–52, 254 Wis. 2d 442, 647 N.W.2d 189, which recognizes that constitutional instructional error is subject to application of the harmless error analysis articulated in *Neder v. United States,* 527 U.S. 1, 15 (1999).

¶ 76. In *Neder,* the United States Supreme Court set forth the test as follows: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id.* at 18. I am satisfied that under the harmless error analysis, if there was instructional error here, it was harmless for the reasons outlined in the majority opinion.

II

¶ 77. Since this case can be, and has been, resolved by the majority on the basis of harmless error, there is no need whatsoever for the majority to reach

625

out unnecessarily and overrule *State v. Mikkelson,* 2002 WI App 152, 256 Wis. 2d 132, 647 N.W.2d 421. Majority op., ¶ 27. What is even more difficult to understand is why this is being done when the majority acknowledges that Ferguson is not even relying on *Mikkelson.* Majority op., ¶ 27 n.8.

¶ 78. The majority doesn't stop with overruling *Mikkelson,* but rather proceeds to decide that a warrantless entry into a person's home should be evaluated on the basis of whether the law enforcement officers are dealing with an offense that is "a jailable or nonjailable offense." Majority op., ¶ 29.

¶ 79. I sincerely doubt that a law enforcement officer will easily be able to determine, perhaps in the middle of the night, and certainly without the knowledge of what offense the prosecuting authority will ultimately decide to charge, whether the offense involved "is a jailable or nonjailable offense."

¶ 80. Knowing that in many communities charging decisions involve a choice between a criminal offense or an ordinance violation—e.g., possession of marijuana—this new test appears to be totally unworkable. It offers the police officers on the front line almost no real guidance in deciding whether a warrantless entry into someone's home will ultimately be justified.

¶ 81. All of this unnecessary reaching out by the majority is without sufficient recognition of the protections for persons and property embodied in the Fourth Amendment to the United State Constitution and in Article I, Section 11 of the Wisconsin Constitution. The new test adopted by the majority doesn't involve a seizure on the street or in an automobile, but rather a seizure of a person after entry into the person's home without a warrant. As Justice Antonin Scalia has rightly pointed out, " 'At the very core' of the Fourth

Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States,* 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961), and citing *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990); *Payton v. New York,* 445 U.S. 573, 586 (1980)).

¶ 82. For the reasons stated, I respectfully concur.

¶ 83. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON, and Justice ANN WALSH BRADLEY join Part II of this concurrence.