**2019 WI App 68**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2018AP1620-CR

†Petition for Review Filed

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**JEFFREY L. IONESCU,**

**DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | November 13, 2019 |
| Submitted on Briefs: | August 15, 2019 |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Reilly, P.J., and Gundrum, J. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jorge R. Fragoso*, assistant state public defender of Milwaukee. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Tiffany M. Winter*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

November 13, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    2018AP1620-CR

STATE OF WISCONSIN

Cir. Ct. No. 2016CF1005

IN COURT OF APPEALS

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

 V.

JEFFREY L. IONESCU,

    DEFENDANT-APPELLANT.

        APPEAL from a judgment of the circuit court for Waukesha County: LEE S. DREYFUS, JR., Judge. *Affirmed*.

        Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

        ¶1     GUNDRUM, J.     Jeffrey Ionescu appeals from his judgment of conviction for burglary, challenging the circuit court's denial of his motion to suppress evidence.     Specifically, he claims New Berlin Police Officer James Ament, a K-9 officer, violated his Fourth Amendment rights when Ament

and his trained tracking dog, Condor, entered onto the yard of Ionescu's mother without a warrant while tracking a burglar, Ionescu. Because we conclude Ament's entry was lawful as he was in "hot pursuit" of Ionescu, we affirm.

## *Background*

¶2     Following Ament and Condor's tracking of a burglary suspect through multiple yards, onto the property of Ionescu's mother, and ultimately up to the door of a motor home in which Ionescu stayed, Ionescu was arrested and charged with multiple offenses. He brought a motion to suppress evidence asserting that Ament and Condor could not lawfully enter onto his mother's yard without a warrant. An evidentiary hearing was held, at which the following relevant evidence was presented.

¶3     Ament testified that shortly after 4 a.m. on June 6, 2016, he was dispatched to a New Berlin home due to a report of a burglary in progress. Ament was informed that the homeowner had heard noises in his garage, investigated, and found an individual inside of his vehicle. Upon Ament's arrival at the home, the homeowner informed Ament that the burglary suspect had fled, cutting west across the homeowner's yard. Due to the dew on the ground, Ament "could see one set of footprints heading where the homeowner said he saw the suspect last run."

¶4     Ament and Condor began tracking the burglary suspect,[1] and:

---

[1] Ament testified that he and Condor were trained and certified as a team, with Condor being "specifically trained … to continue to follow [a subject's] scent in the air as well as along the track." Condor is also "able to scent discriminate, so [Ament] c[ould] tell him to follow [a] specific person's track and not [just] any person he runs into."

> Condor takes me down the road and we lose that track on the road because it is very difficult to track there. However, at a point he does again locate a track that heads through a series of backyards. During that time at various points I can see one set of footprints in that dew based on the conditions of the grass that are sometimes apparent and sometimes not. Condor is filling in those gaps.

The set of footprints was consistent with those Ament observed leaving the homeowner's residence, "seem[ed] to follow a direct series," and was the only set Ament saw in the area. Ament and Condor traversed approximately ten to twelve backyards, losing the track one more time, but finding it "and verify[ing] with footprints again." After tracking for twenty to thirty minutes and approximately 2000 feet, Ament and Condor followed the track largely along the property line between two properties, from the back of the properties to the front. A motor home was parked in the front of one of these properties. Coming up the property line to "the edge of the motor home," Condor "immediately [took] a hard left turn" and Ament "c[ould] see those same footprints. The dog as well as the footprints go directly to the … door of that motor home." Condor "sat and stared at the door," which informed Ament that Condor had "finished his track and he thinks that the person is in there."

¶5 An officer who was with Ament knocked on the door of the motor home, but there was no answer. They then walked to the front door of the house on the property and made contact with Ionescu's mother, who indicated she owned the residence and the motor home but that Ionescu "stayed" in the motor home. She willingly opened the motor home for the officers and gave them permission to enter. According to the criminal complaint, the officers found Ionescu as well as a watch that had been stolen from the homeowner's vehicle.

3

¶6    The circuit court found that the pursuit began "in very close proximity" to when the burglary occurred.

> As soon as the homeowner had contact with the individual that took off, [he] called the police and they responded in short order…. They see a track going the direction the homeowner described as the individual took off in and they began following it…. The officers were following what would be a current track or believed to be a current track. Ultimately, it led to the Ionescu property.

The court denied the suppression motion, expressing that it was "satisfied" the circumstances that "led up to the contact and the search w[ere] appropriate."[2] Ionescu pled to the burglary charge, was sentenced, and now appeals.

## *Discussion*

¶7    Ionescu contends Ament violated his Fourth Amendment rights "by bringing a trained police dog onto the curtilage of his home" without a warrant.[3] We conclude the circuit court did not err in denying his suppression motion

---

[2] The circuit court also concluded that Ionescu lacked standing to challenge the police entry onto his mother's property. On appeal, Ionescu's precise standing argument is unclear, but he appears to ultimately claim that he has standing because he lived in the motor home and the motor home was parked within the curtilage of the house. We assume, without deciding, that he has standing.

[3] In his written motion to suppress evidence, Ionescu wrote that he was challenging the "warrantless entry onto [his] property, which led to the search of" the motor home. At the hearing on the motion, his counsel clarified:

> [T]he part of the case that we're challenging is … the officers ent[rance onto] the property with the dog that was sniffing the supposed footprints … that was an illegal search. Once the dog then alerts on the vehicle, and the search continues from there, we're not challenging that portion. So, the portion we're challenging is the entry on to the property of the sniffing dog with the officers.

4

because Ament and Condor's entry onto the yard of Ionescu's mother was lawful despite the absence of a warrant. This is so because Ament and Condor were in "hot pursuit" of the suspect, Ionescu, whom they had probable cause to believe had recently committed the jailable offense of burglary.

¶8     "The review of a circuit court's order granting or denying a suppression motion presents a question of constitutional fact. We will uphold the court's factual findings unless they are clearly erroneous, but we independently apply constitutional principles to those facts." *State v. Coffee*, 2019 WI App 25, ¶6, 387 Wis. 2d 673, 929 N.W.2d 245 (citation omitted), *review granted*, 2019 WI 100, __ Wis. 2d __, __ N.W.2d __. Here, neither party argues that any of the court's findings of fact are clearly erroneous. Thus, we apply the relevant constitutional principles to the facts.

¶9     Under the Fourth Amendment, warrantless searches inside a home or its curtilage[4] are presumptively unreasonable and unlawful. *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *State v. Weber*, 2016 WI 96, ¶18, 372 Wis. 2d 202, 887 N.W.2d 554. Such searches are reasonable and lawful, however, when there is probable cause to believe a jailable offense has been committed and an exigent circumstance exists. *State v. Ferguson*, 2009 WI 50, ¶¶19, 29, 317 Wis. 2d 586, 767 N.W.2d 187. An exigent circumstance exists "when 'it would be unreasonable and contrary to public policy to bar law enforcement officers at the

---

[4] The curtilage of the home—"the area immediately surrounding and associated with the home"—is regarded as "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation omitted).

door,'" *id*., ¶19 (citation omitted), or, in this case, at the edge of the curtilage. Here, we are concerned only with the exigent circumstance of hot pursuit.

¶10    Our state supreme court and the United States Supreme Court have both recognized that "law enforcement officers may make a warrantless entry onto private property ... to engage in 'hot pursuit' of a fleeing suspect." *Weber*, 372 Wis. 2d 202, ¶28 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "The basic ingredient of the exigency of hot pursuit is 'immediate or continuous pursuit of [a suspect] from the scene of a crime.'" *Weber*, 372 Wis. 2d 202, ¶28 (alteration in original) (citing *State v. Richter*, 2000 WI 58, ¶32, 235 Wis. 2d 524, 612 N.W.2d 29).

¶11    Ionescu argues Ament was not in hot pursuit when he and Condor entered onto the yard of Ionescu's mother because the burglary victim "was only able to tell the police in which direction the suspect had fled," the track Ament and Condor followed was "invisible," and it took police "5 to 10 minutes … to arrive" after the burglary and "the tracking exercise took 25 to 30 minutes" and covered approximately 2000 feet. The officers reached the motor home, he states, "30 to 40 minutes after the reported burglary," traveling "at a speed of approximately .75 miles per hour." Ionescu insists "there was no immediacy to the tracking" because

"[a]t no point did the police see [Ionescu] or accelerate their tracking in order to catch up to him." We are not swayed.[5]

¶12   As the circuit court noted, and Ionescu acknowledges, Ament and Condor began tracking the burglary suspect just minutes after he fled from the homeowner's garage. After learning in which direction the suspect fled, they engaged in an immediate and continuous pursuit, beginning from the burglarized homeowner's property and ending at the motor home. While Ionescu refers to the track Ament and Condor followed as "invisible," this characterization is not entirely accurate as the track was at times visible to Ament in that he could see footprints in the dew that "seem[ed] to follow a direct series." Furthermore, Condor was trained to use his sense of smell to track, and the scent track, while not visible, was clearly present. As Ament testified, he and Condor followed the track up the property line to "the edge of the motor home" when Condor "immediately [took] a hard left turn and [Ament] c[ould] see those same footprints." Ament observed "[t]he dog as well as the footprints go directly to the … door of that motor home."

¶13   Ionescu also complains that Ament only learned from the homeowner the direction in which the burglary suspect fled and did not himself

---

[5] Ionescu asserts that Ament and Condor's warrantless entry onto his mother's yard is prohibited by *Jardines*, 569 U.S. 1. *Jardines* does not aid Ionescu as the only questions in that case were whether law enforcement's use of a drug-sniffing dog in the curtilage of a home constituted a search within the meaning of the Fourth Amendment and whether the property owner had implicitly authorized such a search, *see id.* at 10-11, neither of which are issues in this case. Furthermore, the officers in *Jardines* were on a fishing expedition based upon an "unverified tip" that marijuana was being grown in the home, *id.* at 3, whereas in this case, Ament had probable cause to believe a burglary had been committed and that, based upon the footprints and the scent, the burglary suspect had entered the yard of Ionescu's mother and, ultimately, the motor home.

see the suspect fleeing. This complaint goes nowhere as our supreme court held in *Richter*, 235 Wis. 2d 524, ¶¶33-36, that such observation by law enforcement is not required. In *Richter*, as in this case, a police officer responded to a report of a home burglary in progress. Upon the officer's arrival at the scene, the victim told the officer she had observed the suspect flee her home and enter a nearby home. *Id.*, ¶1. In pursuit of the suspect, the officer subsequently entered that home without a warrant. *Id.*, ¶¶6-7. We concluded the exigency of hot pursuit did not apply because "[t]he violation was observed by a witness, not the officer, and some period of time elapsed between the time [the officer] arrived at the scene and the time he approached" the home the victim had observed the burglar enter. *State v. Richter*, 224 Wis. 2d 814, 821, 592 N.W.2d 310 (Ct. App. 1999). On appeal, our supreme court disagreed, holding that a police officer need not "personally observe the crime or the fleeing suspect" for the exigency of hot pursuit to justify a warrantless entry. *Richter*, 235 Wis. 2d 524, ¶¶32-33. The court added:

> [The officer] responded to a dispatch and picked up the trail of a fleeing suspect from an eyewitness account. His response to the scene of the crime was immediate, and his pursuit of the suspect was immediate and continuous upon his arrival on the scene and rapid collection of information regarding the whereabouts of the suspect. There is no evidence in this record of any delay in [the officer's] response or pursuit that would have interrupted the immediacy and continuity of the situation and therefore dissipated the exigency. We conclude that [the officer's] entry was justified by the exigent circumstance of hot pursuit.

*Id.*, ¶36. These words neatly fit the case now before us and apply to it with equal force.

¶14    While Ionescu also argues this was not a hot pursuit because it took twenty-five to thirty minutes for Ament and Condor to successfully track Ionescu to the motor home, "at a speed of approximately .75 miles per hour," these

observations do not undermine the hot pursuit analysis. Tracking a suspect's footprints and scent in the dark is necessarily a time-consuming task, and the amount of time will of course depend on how far the suspect has fled. As our state supreme court has recently reaffirmed, "[t]he 'touchstone of the Fourth Amendment is reasonableness,' and '[r]easonableness ... is measured in objective terms by examining the totality of the circumstances.'" *Weber*, 372 Wis. 2d 202, ¶34 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). For that reason, we find persuasive the following language from our decision in *State v. Palmersheim*, No. 2018AP746-CR, unpublished slip op. ¶28 (WI App Oct. 31, 2018), in which we considered an officer's warrantless entry by breaking a garage safety beam with his foot in order to prevent the garage door from closing and the suspect from evading apprehension:

> Whether a pursuit of a criminal suspect is a "hot" pursuit depends on the particular circumstances of each case. If a suspect is speeding away in a vehicle, hot pursuit will no doubt involve an officer following the suspect in a vehicle, quite possibly, but not necessarily, at a high rate of speed. If a suspect is running through back yards and alleys attempting to escape from an officer, the officer will likely need to engage in a hot-pursuit foot race requiring speeds near that of a sprint. If the pursuit goes longer, that sprint may turn to a more paced foot race, yet still be a hot pursuit. If an officer is pursuing a suspect and the suspect tries to close a door, garage door or otherwise, to prevent apprehension, hot pursuit will necessarily include preventing the door from being closed.

*Id.*, ¶28. We further observed that there was

> no indication Palmersheim ran from the officer, so hot pursuit could be accomplished by the officer "stepp[ing] up [his] pace" to "briskly walk[ing] and hustl[ing] up" to try to catch Palmersheim. The officer then stopped the closing of the garage door as part of his pursuit. The manner in which the officer engaged in hot pursuit was appropriately measured to the manner Palmersheim used to try to evade the officer.

*Id.*, ¶29.

¶15 In the case now before us, there is no evidence to suggest Ament and Condor did not follow the footprints and scent as speedily as efficiency and effectiveness would allow. The manner in which Ament pursued Ionescu "was appropriately measured" to the manner Ionescu used to try to evade apprehension. *See id.* Hurrying the tracking process, as Ionescu argues was necessary for this to be a hot pursuit, would no doubt have frustrated the very pursuit Ament and Condor were trying to effectively accomplish.[6] Based upon the circumstances of this case, the speed at which the pursuit occurred in no way lessened its "hot" nature, and Ionescu identifies no legal support to suggest otherwise.[7]

¶16 In this case, Ament immediately and continuously pursued the burglary suspect, Ionescu, so he would not evade capture. Ament was promptly dispatched to the scene of the crime. He was shown the direction in which the suspect had run and began tracking the suspect with Condor. Ament and Condor were at no time on a mere fishing expedition, traipsing through yards in hopes of finding some evidence leading to the suspect. Rather, they had the evidence, which evidence amounted to probable cause to believe a burglary had occurred and the footprints were those of the suspect—the explanation of the homeowner that his home had been burglarized, his indication as to the direction the suspect

---

[6] We are reminded of a well-used military adage: "Slow is smooth, and smooth is fast."

[7] *See* **United States v. Holland**, 511 F.2d 38, 44 (6th Cir. 1975) (an approximately thirty-minute pursuit of a bank-robbery suspect by following tracks in the snow and utilizing vehicular travel to multiple houses satisfied the hot pursuit exception); **United States v. Franklin**, No. 5:11-CR-42-KKC, slip op. at 3, 10 (E.D. Ky. Aug. 31, 2011) (officers' forty-five-minute to one-hour pursuit, tracking the suspect's footprints in the snow for approximately a mile-and-a-half, satisfied the hot pursuit exception).

had run, and the trail of footprints and scent from the homeowner's property to the motor home. The pursuit remained continuous from the moment it began at the burglarized homeowner's property until Condor sat outside the motor home door to indicate the suspect was inside. The pursuit was indeed a hot pursuit satisfying this Fourth Amendment exception to the warrant requirement.[8] Ament and Condor's entry onto the yard of Ionescu's mother for the purpose of tracking the burglary suspect's footprints and scent up to the motor home door was reasonable and thus lawful.[9]

*By the Court.*—Judgment affirmed.

---

[8] *See*, *e.g.*, ***People v. Beverford***, No. B195779, slip op. at 2-6 (Cal. Ct. App. Apr. 22, 2008) (hot pursuit justified warrantless entry where police dog tracked scent from gloves believed to have been dropped by fleeing suspect to sliding glass door at rear of home); ***People v. Joyner***, 287 N.W.2d 286, 288-89 (Mich. Ct. App. 1979) (hot pursuit justified warrantless entry "[i]n light of … rapid follow-up" of the crime and "no break in the chain of immediate pursuit" by the tracking dog "used to trace defendant to the home").

[9] As our supreme court noted in ***State v. Weber***, 2016 WI 96, ¶38, 372 Wis. 2d 202, 887 N.W.2d 554, the officer's actions there "were calculated to accomplish no more than was absolutely necessary to halt Weber's escape" into his home. Ament's actions here were similarly calculated. Despite Condor clearly signaling that the burglary suspect had entered the motor home, Ament did not then enter. Another officer with him knocked on the door and after receiving no response, sought and received permission to enter the motor home from Ionescu's mother, who was the owner of the motor home and the property on which it was parked.